**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

APR 2 3 2003

02C 3012

Southern District of Ohio
Dayton Division

UNITED STATES OF AMERICA, ex rel.
DIMITRI YANNACOPOULOS,

                Plaintiffs,

v.

GENERAL DYNAMICS and LOCKHEED
MARTIN CORPORATION,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. C-1-96-456

The Honorable Thomas M. Rose
Magistrate Judge Michael K. Merz

FILED UNDER SEAL PURSUANT
TO 31 U.S.C. §3730(b)(2)

FALSE CLAIMS ACT COMPLAINT

JURY TRIAL DEMANDED

**RECEIVED**

JUN 6 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**

MAY 6 2003

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.     Plaintiff Dimitri Yannacopoulos ("Yannacopoulos," "plaintiff," or "relator"), by and through his attorneys, brings this action on behalf of himself and on behalf of the United States of America (the "United States" or the "Government") for treble damages, civil penalties, and other relief, based upon defendants' violations of the False Claims Act, 31 U.S.C. §3729 et seq. (the "FCA"). The case arises from a series of violations of the FCA committed in the sale of F-16 aircraft to Greece. The false claims were paid by the United States through the Foreign Military Sales Financing Program (the "FMS" program) of the Arms Export Control Act of 1976, 22 U.S.C. §2751 et seq.

2.     As described in detail in this complaint, General Dynamics and Lockheed Martin Corporation, knowingly presented or caused to be presented to officers, agents, or employees of the United States false certifications, false records, false statements, and false claims for payment or approval under various F-16 contracts paid for with FMS taxpayer funds, in violation of 31 U.S.C. §§3729(a)(1), (a)(2), and (a)(7).

3.     Defendants' multiple and massive violations of the FCA involved three broad categories of fraud and misconduct. First, defendants planned to collect, and did collect, more than $150,000,000.00 in fraudulently obtained federal funds by overcharging for, double

billing for, and failing to deliver elements of the F-16 program. Second, defendants planned to use and implemented a fraudulent-progress payment scheme to collect up front as much of the fraudulent payments as possible and to retain these illegal payments as long as possible in order to earn an additional $130,000,000.00 in interest from the free use of U.S. taxpayer money. Third, defendants illegally diverted FMS funds to capitalize a Greek-charted company in violation of federal regulations and their contract.

4.      Defendants fraudulently collected funds and fraudulently secured up-front payments through direct false claims. Defendants prolonged their free use of the funds by "reverse" false claims and accounting manipulations.

5.      As described in detail below, key elements of defendants' pattern of fraudulent conduct in relation to the F-16 contracts include:

(a)     falsely inflating the contract prices for the F-16 airframe, engines, and related equipment and services;

(b)     falsely billing the United States for depot-level maintenance, co-production, and Internal Electronic Counter Measures ("IECM") integration;

(c)     illegally diverting FMS funds to establish and capitalize a Greek corporation, HBDIC, that is 95% owned and controlled by defendants and other American owned companies and enriched defendants at the expense of the U.S. taxpayers;

(d)     illegally front-loading progress payments under the contracts and collecting FMS monies in excess of contract expenditures; and

(e)     concealing their obligation to remit tens of millions of fraudulently obtained dollars to the United States Government.

6.      The FCA violations alleged herein all occurred on an ongoing and continuing basis up to and including the date of the filing of the original complaint and, on information and belief, are continuing to this day.

7.      Following a statement of jurisdiction and venue and a description of the parties, this amended complaint first describes FMS sales in general (section I), then describes how General Dynamics obtained the contract to supply F-16 aircraft to Greece, with particular focus on how the defendant GD, unbeknownst to the governments of Greece and the United

2

States, corrupted the contracting process (section II); and then describes how defendants violated the FCA by fraudulently collecting funds from the United States (section III), illegally accelerating payment of funds (section IV), and illegally retaining them (section V).

## JURISDICTION AND VENUE

8.    This action arises under the False Claims Act, 31 U.S.C. §3729 et seq. This Court therefore has subject-matter jurisdiction pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732(a) because this action arises under the laws of the United States. This Court also has jurisdiction pursuant to 28 U.S.C. §1345, which provides the district courts original jurisdiction over all civil actions commenced by the United States of America.

9.    Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(c) because defendants can be found, reside, and/or transact business in that District.

## PARTIES

### Plaintiffs

10.    This action is brought on behalf of the United States of America by plaintiff-relator Dimitri Yannacopoulos. The United States, through the enactment of the FCA, has authorized private individuals, such as relator, to bring suits such as this action to recover damages sustained by the Government as a result of the submission of false claims, together with penalties; treble damages; and costs of suit, including attorneys' fees. The taxpayer funds at issue in this case came from the Defense Security Assistance Agency ("DSAA") (currently known as the Defense Security Cooperation Agency). The DSAA oversaw all FMS contracts between foreign governments, such as Greece, and U.S. manufacturers, such as General Dynamics.

11.    At all relevant times, relator was licensed by Greece as an independent commercial sales representative. Relator, who resides in Greece, worked for General Dynamics as a consultant and sales representative on the Greek F-16 acquisition, as well as

3

other commercial and military projects. General Dynamics was referred to relator at the specific recommendation of Ronald D. Flack, an officer of the United States Department of State at the U.S. Embassy in Athens. Relator reported directly to General Dynamics' top executives and members of General Dynamics' board of directors. He promoted the F-16 sale to Greece, interacting and communicating with the highest levels of the Greek government. Relator Yannacopoulos has direct knowledge of the allegations underlying this complaint, independent of any public disclosures, and voluntarily brought his information to the Government prior to bringing this action. Yannacopoulos is the original source of this information to the United States Government.

## Defendants

12.    Defendant General Dynamics is a Delaware corporation with its headquarters in Virginia and with subsidiaries and plants throughout Illinois. Acting in part through its consolidated affiliate, General Dynamics Fort Worth Division ("GDFW"), defendant General Dynamics, during the time period relevant to this action, was engaged as the lead U.S. contractor in the business of developing, manufacturing, assembling, and selling the F-16 fighter aircraft and support services to the United States Government and foreign governments. On December 8, 1992, defendant General Dynamics sold GDFW to defendant Lockheed Martin Corporation (then known Lockheed Corporation). The sale was consummated on or about February 28, 1993.

13.    Defendant General Dynamics manufactured the F-16 airframe, assembled and delivered the F-16 aircraft, supplied support services for the F-16 aircraft, and was a prime contractor on the F-16 sale to Greece (the "F-16 Contract," Government reference case GR-S-ACF).

14.    Defendant Lockheed Martin Corporation ("Lockheed") is a Delaware corporation with its corporate headquarters located in Bethesda, Maryland, and has corporate offices in Algonquin, Illinois. Defendant Lockheed (then known as Lockheed Corporation)

4

acquired GDFW by an asset purchase agreement dated December 8, 1992. The transaction was consummated on or about February 28, 1993. In connection with that transaction, Lockheed also acquired General Dynamics' interests and shares in Hellenic Business Development Investment Company, S.A., and General Dynamics' responsibilities relative to the sale of the F-16 aircraft. Lockheed submitted claims and received some of the monies disputed in this action. Lockheed is also liable as a successor in interest. Lockheed assumed the responsibilities of (a) the first Greek F-16 contract for 40 F-16s; (b) the performance on a second, follow-on F-16 contract (for an additional 40 aircraft) negotiated and secured by General Dynamics just prior to Lockheed's acquisition of GDFW; and (c) a third, subsequent contract (for an additional 50 F-16 aircraft).

I. Foreign Military Sales.

15.    The FMS Program of the Arms Export Control Act, 22 U.S.C. §2751 et seq. (the "Act"), authorizes sales of American military equipment from the United States Government to certain foreign allied governments. These are known as "government-to-government" sales. In addition, the Act authorizes the United States to provide loans, as well as subsidized loan and grant funds, to enable certain foreign allied nations to purchase American military equipment directly from United States commercial manufacturers and suppliers. These "direct" or "commercial" sales are also known as Foreign Military Financing ("FMF") transactions and are subject to regulation, supervision, and approval by the United States Government department and agencies, including the DSAA, the Department of Defense, and the Department of State.

16.    The supply of the initial 40 F-16 aircraft to Greece was based upon a direct commercial sale between Greece and a number of the contractors led by defendant General Dynamics, paid for with U.S. taxpayer funds pursuant to the FMS program. Specifically, the contracts were financed with funds placed in the FMF Greek escrow or trust account maintained by the DSAA. Pursuant to the FMF program, GD submitted quarterly invoices to

5

Greece, based upon pre-established "milestones," between April, 1986, and October, 1990. After its acquisition of GD, quarterly invoices were submitted by Lockheed. The invoices and certifications of performance were forwarded by Greece to DSAA. During the implementation of the contracts, the FMF Greek escrow or trust account contained approximately $150 million in grants and hundreds of millions of dollars in concessionary loans subsidized by U.S. taxpayers.

17.     To safeguard the use of taxpayer FMS funds, the DSAA imposed certification requirements on manufacturers, such as General Dynamics, that produce military goods and services financed by FMS funds. In addition, the DSAA promulgated detailed guidelines governing the use of FMS funds.

18.     To ensure compliance with these certification requirements, guidelines, and other restrictions, contracts involving the use of FMS funds must be submitted to the DSAA for approval and must be accompanied by a certification signed by the contractor ("contractor's certification"). Moreover, all FMF payments made to a contractor must comply with the terms of the contracts approved by the DSAA.

19.     As required in February, 1986, General Dynamics submitted a signed contractor's certification to the DSAA in relation to the F-16 Contract. In the certification, defendant GD committed to specific obligations and disclosures in order to start the flow of federal funds.

20.     Specifically, in the certification, defendant GD certified that it would not receive any downpayment that exceeded costs incurred at the time of the invoice, plus termination liability, and less profit. Moreover, applicable DSAA guidelines, such as the "Guidelines for FMS Loan Financing of Direct Commercial Contracts" (dated 10/09/85), specified that progress-payment invoices were to be based upon, and reflect, actual costs incurred or products delivered.

21.     Defendant GD also certified to the DSAA that there were no undisclosed amendments, modifications, side letters, or supplementary agreements to the F-16 Contract.

22.     In addition, defendant's "contractor's certification" certifies that (a) any changes to the Contract would be reported to the federal government upon effect; (b) the United States Government be given access to the contractors' books and records; (c) no rebates, gifts, or gratuities have been given contrary to United States law to officers, officials, or employees of the purchaser; (d) the materials or components to be provided are predominantly of U.S. manufacture, except as approved by the DSAA; (e) the funds received will not be used to purchase services from non-U.S. contractors, except as approved by the DSAA; and (f) the contractors' invoices will be prepared in accordance with the relevant provisions of the contract.

23.     As the lead contractor, General Dynamics (and then Lockheed) was required to provide to Greece the DSAA invoices, quarterly waybills, and DD250 forms that were required by the contract to support every claim for payment and upon which the DSAA relied in releasing funds.

24.     By reason of the acts and practices alleged in this complaint, defendants violated the certification requirements, the underlying Contract, and other regulatory requirements of the DSAA, causing false claims to be made against and damaging the United States.

II.     Defendants' corruption of the F-16 bidding process and evolution of the scheme to overbill the United States Government.

        A. The Greek search for a new fighter aircraft.

25.     In 1978, Greece initiated a search for a modern fighter aircraft to replace its aging fleet. The selection process for the new fighter aircraft ("NFA") involved both the Greek military and the civilian government. The final decision on the NFA contract was to be made at the ministerial level of the Greek government from fighter aircraft which met the technical and operational specifications set by the Hellenic Air Force ("HAF").

26. Greece set two requirements for the NFA. First, it had to incorporate technology and performance characteristics set by HAF to ensure a balance of air power with the larger air force of its historic adversary, Turkey.

27. Second the NFA manufacturer had to commit to an industrial investment package, referred to as "offsets." Offsets are compensating transactions given to a country to offset the costs of major defense acquisitions. They may be in the form of "co-production," the local production of part of the product acquired, which is then purchased by the manufacturer at agreed quantities and prices. These types of offsets are known as "direct." Offsets may also be in the form of industrial and commercial opportunities for the purchasing country. These types of offsets are known as "indirect."

B. Initial intended government-to-government sale.

28. Negotiations between Greece and General Dynamics for the purchase of the F-16 began informally in late 1979.

29. By 1981, Greece narrowed its list of NFA candidates to four -- the German/English consortium's Tornado, the French Mirage 2000, McDonnell Douglas' F-18, and General Dynamics' F-16, and issued requests for proposals ("RFPs") from the four competitors. The RFPs sought both direct co-production offsets and indirect offsets. They provided that Greece would determine which indirect offsets would be acceptable and assign an offset credit value for each proposed direct offset.

30. In 1981, Greece requested price and availability data for the F-16 and F-18 from the United States Government and offset proposals directly from the F-16 and F-18 manufacturers.

31. At the time, the Greek government intended to negotiate directly with the United States for either of these two fighter aircraft through typical FMS procedures; that is, as a "government-to-government" FMS sales contract, as opposed to a direct commercial sales

contract. Greece intended to negotiate and sign separate agreements and contracts for the offsets directly with the selected manufacturer.

32. By United States Government law and regulation, offset programs were not to be funded by FMS funds, and the United States Government did not participate in them except to review co-production agreements.

33. On February 9, 1981, Greece informed General Dynamics that the F-16 was selected subject to General Dynamics justifying the economic figures presented in its offset package.

34. In March, 1981, the DSAA provided Greece with planning and review data for a version of the F-16 called the "A/B," including planned enhancements which would evolve into the F-16 "C/D" and setting 1985 as the starting year for delivery of the aircraft.

35. In August, 1981, following its review of the co-production component of General Dynamics' offset proposal, the DSAA officially released the F-16 offset package to Greece.

C. 1982 Greek election and decision to pursue a direct commercial sale.

36. In 1982, a new Greek government took office and, on the recommendation of the HAF, abandoned its original intention to negotiate a "government-to-government" contract. Instead, Greece invited General Dynamics and McDonnell-Douglas to submit draft contracts for the direct commercial sale of the F-16 and F-18, financed from Greek FMS funds held in escrow by the DSAA.

37. In August, 1982, General Dynamics submitted a draft contract for the F-16 to the HAF. At the same time, negotiations began between the HAF and General Dynamics on F-16 enhancement options required to meet the HAF's specification.

38. During the final state of contract negotiations, in November, 1982, the DSAA provided a briefing to Greece and explained that (a) any requested options that would enhance the standard F-16 baseline configuration would be subject to U.S. approval; (2) the United

9

States Government would not guarantee General Dynamics' or McDonnell-Douglas' performance of the offset agreements; and (c) the United States Government would not pick up or guarantee the cost of any penalties incurred by the manufacturers for failure to perform offset commitments.

39.    After the DSAA briefing, in December, 1982, the HAF prepared a technical and operational evaluation of the four competing aircraft and found the F-16 C/D to be the least-competitive technologically.  The HAF requirements were for an aircraft that contained performance characteristics and technology much closer to McDonnell-Douglas' F-18.

40.    In January, 1983, following the DSAA briefing, Greece revised its offset requirements and established an offset requirement of 80% of the total NFA contract price.  In addition, each bidder was required to guarantee its offset commitments with a liquidated damages clause that provided for penalties should the manufacturer fail to perform its offset commitments.

D.  Underline General Dynamics' development of the "F-16G" and offset schemes.

41.    Since early 1981, the F-16 was in competition with the F-18 for major international sales in Canada, Australia, Spain, Greece, and Turkey.  By August, 1982, the F-16 industrial team, led by General Dynamics, had lost three major sales in succession:  to Canada, Australia, and Spain.  Each country had selected the F-18.

42.    On August 3, 1982, just as General Dynamics was submitting its draft contract to Greece to begin negotiations, General Dynamics executive Paul Scanlan and employees Robert Miller and A.G. Leris met with General Dynamics' consultant Dimitri Countouris, a retired HAF general, and his associate, retired HAF general Basil Papavassiliou, to discuss strategies to secure the complicity of certain active HAF officers who were members of the HAF's NFA negotiations committee to ensure the selection of the F-16 over the F-18.  Their focus was on the chairman of the NFA negotiations committee, General John Marinakis.

43.     In March, 1983, General Dynamics' executive, Larry Jones, the Greek F-16 program director, and Robby Robbins shared with relator their concern that General Dynamics consultant Countouris had visited General Dynamics' headquarters in St. Louis and solicited $10 million for payments to Greek officials, and that General Dynamics executive vice president James Mellor was supporting Countouris' request.

44.     Relator advised the General Dynamics executives not to participate in the payment of any money to Greek officials to influence the outcome of the competition to favor the F-16.

45.     In spite of relator's admonitions, documents produced in 1993 indicate that certain HAF contracting officers were acting as General Dynamics and F-16 team "insiders" to rig the competitive process in General Dynamics' favor.  Specifically, in December, 1982, these HAF officers advised General Dynamics how to conceal the price inflations "<u>buried deep</u>" in its proposals "<u>without highlight</u>"; in February, 1984, they advised General Dynamics how to "<u>reconfigure</u>" its prices "<u>to make the selected changes less visible to the politicians</u>"; and in October, 1986, they advised General Dynamics how to find money for offsets "<u>by overcharging</u>" the contract.  Indeed, in March, 1984, Nikos Mourkogiannais, an employee and/or consultant of Westinghouse and General Dynamics, directed at least one payment of $2,000.00 to the London bank account of John Papanicolaou, the economic advisor to the Prime Minister of Greece.

46.     In late October, 1983, General Dynamics severed its relationship with relator allegedly because the Greek Deputy Minister of Defense told General Dynamics it had to "get rid" of relator because he was a "troublemaker [who] talks too much."

47.     At the same time, and in cooperation with certain HAF officers, General Dynamics developed two schemes, one (the F-16G scheme) to overcome the more-rigorous requirements for the operational performance of the NFA, and the second (the offset scheme) to deal with the increased offset requirements of the F-16 Contract.

1. The F-16G scheme.

48.     By February, 1983, General Dynamics, with assistance and guidance from HAF
Major George Goulios, prepared a list of enhanced options that would make the F-16 more
competitive with the F-18 and operationally acceptable to the HAF. General Dynamics'
purpose was to keep the F-16 in the competition with the more advanced F-18.

49.     This list of enhanced options was then designated by General Dynamics in its
proposal as "R&D clearance" options. General Dynamics' proposal noted the need to obtain
prior approval or "clearance" for export from the United States Government before these
enhancements could be included in the "standard" F-16 C/D "baseline" specification.

50.     In or about May, 1983, Larry Jones, General Dynamics' F-16 Greek program
director, confided to relator his concern that General Dynamics would not be able to obtain
export "clearance" from the United States on certain critical enhanced options, and asked
relator to recommend to Greece that it request the required "clearance" directly from the
United States Government as a part of the Greek government negotiations over the extension of
U.S. military base rights in Greece.

51.     By March, 1984, General Dynamics proposed a new enhanced aircraft to be
delivered to Greece, which it called the "F-16G." General Dynamics, with the assistance of
certain cooperating HAF contracting officers, prepared a revised price proposal that
reconfigured the itemized and individually-priced list of "R&D clearance" options into a single
option package with a single total price, in order "to make the selected options less visible to
the politicians." At the same time, certain HAF contracting officers changed the HAF's
"baseline configuration" of the F-16 to include the "R&D clearance" enhanced options.

52.     Indeed, the new aircraft configuration was not authorized by the DSAA or any
other U.S. authority. The "F-16G" proposal (which purported to incorporate the superior
features and operational capabilities sought by the HAF that the existing, standard F-16 C/D
configuration did not) was a scheme to present the F-16G as operationally equivalent to the F-
18 and to inflate the price of the F-16 to just under the price of the F-18. The fictitious F-16G

12

configuration increased the price of the F-16 airframe by approximately $128 million (in January, 1984 dollars) and it increased the price of the overall F-16 package by approximately $200 million.

53.    Defendant General Dynamics never intended to deliver the F-16G to Greece.

54.    Defendant General Dynamics never submitted the "baseline specification" integrating the principle features of this purportedly-enhanced version of the F-16 C/D to the United States Government for export approval and never received an arms export license from the Department of State to sell the enhanced F-16G configuration, or even to offer the F-16G configuration.

55.    Nevertheless, on October 12, 1984, General Dynamics' chairman and CEO, D.S. Lewis, sent a letter to the Greek Minister of Coordination, Gerassimos Arsenis, that stated:

> Mister Minister, you may be assured that the Greek New Fighter Aircraft program is very important to General Dynamics and the other members of the F-16 industrial team. The previous two years of hard work by government and industry negotiators has produced the necessary technical and contractual agreements so that the F-16G program can be quickly implemented after announcement of the Greek government's decision.

56.    On November 14, 1984, Greece announced its decision to purchase 40 F-16Gs.

57.    On November 16, 1984, Lewis wrote Arsenis that General Dynamics "is very pleased and honored that the government of Greece has selected the F-16G" and stated that "[t]he Hellenic Air Force can rest assured that the F-16G aircraft will be delivered on schedule in full compliance with the contractual terms and conditions previously negotiated with the Hellenic Air Force." Lewis' letter was circulated internally to the select circle of General Dynamics executives involved in the F-16G scheme.

58.    In August, 1993, retired United States Air Force General and General Dynamics executive H. Sechler stated under oath, "There is no such animal" as the F-16G.

59.    Thus, by mid-November, 1984, General Dynamics – through its use of the F-16G scheme – had succeeded in eliminating the competing F-18 from contention, in securing

the Greek sale, and in convincing the Greek government to accept a contract inflated by over $200 million that included a "fly-away" airframe price that was approximately $128 million more than the standard airframe price for the F-16 C/D.

60.  During December, 1984, in furtherance of its scheme, General Dynamics and its allied HAF contracting officers "eliminated certain costly enhancements" from the F-16G baseline specification. The effect was to convert the baseline specification back to the "standard" F-16 C/D specification, with some minor "HAF-peculiar options."

61.  However, having made the selected changes "less visible to the Greek politicians," General Dynamics did not reduce the contract prices proportionately, but managed to retain an inflation of approximately $200 million in the contract price.

## 2. The offset scheme.

62.  Dating back to early 1983, General Dynamics, together with Westinghouse and later also General Electric (GE), devised a scheme to commit to the offsets demanded by Greece – including the penalty provision for non-performance – so as to secure the contract and then to extricate itself from the offset commitments and avoid the penalties. The scheme also included a mechanism by which the General Dyanmics could pass the costs of its offset commitments onto Greece and the United States Government by padding its contract.

63.  This scheme to divert the excess FMS funds obtained as payments for the F-16 to finance their offset liabilities is outlined in a January 24, 1983 memo from Westinghouse's defense group section manager, Myron Rosen, to Henry Gomez, General Dynamics' offset manager for Greece. The memo, which memorialized an earlier meeting, outlines a strategy by which (a) the pricing structure for the F-16 would be padded by $50-100 million; (b) the additional money obtained by General Dynamics, GE, and Westinghouse from FMS funds would be used to capitalize a Greek-chartered company jointly owned by General Dynamics, GE, and Westinghouse that would, at the appropriate moment, be offered to convince Greece to replace the required offset commitment; and (c) the liability of General Dynamics, GE, and

14

Westinghouse for liquidated damages for non-performance of their offset commitments would be eliminated. (The memo also recommends that the plan become the prototype for General Dynamics, GE, and Westinghouse's sales to Turkey, Egypt, and other countries.)

64. This scheme to use FMS funds to capitalize a Greek-charted company, if implemented, would violate United States laws and regulations.

65. At the same time it was developing its offset scheme, General Dynamics submitted final offset proposals confirming its acceptance of firm offset commitments and non-performance penalties required by Greece. On May 4, 1983, General Dynamics unconditionally agreed to Greece's requirement for 80% offset commitments, based on the Greek offset eligibility and crediting formula, to be backed by liquidated damages for any non-performance.

66. General Dynamics' unconditional agreement to the Greek offset requirements was an integral part of General Dynamics' offset proposal through the time Greece announced its selection of the F-16G in November, 1984.

67. However, in March, 1985, shortly after Greece announced the award of NFA contracts to the General Dynamics team, General Dynamics and certain HAF contracting officers, unbeknownst to the Greek Government, modified contract documents mandating General Dynamics' offset commitments and substituted language making General Dynamics' obligations discretionary. This change enabled General Dynamics to proceed with its plan to eventually abandon the offset proposal and substitute the offset scheme outlined in the January 24, 1983 memo.

E.      The switch from the F-16G and offset
        commitments in the General Dynamics' letter of intent.

68. Having won the competition, General Dynamics entered into a letter of intent ("LOI") and ultimately a contract with Greece (namely, the 5/86 contract, singed on January 12, 1987) which eventually (a) substituted a $50 million investment in an offset development company, Hellenic Business Development Investment Company, S.A. ("HBDIC"), in place of

15

a $850 million global offset proposal; (b) included an accelerated payment schedule which would supposedly be counterbalanced by contract-price adjustment obligations to refund any payments in excess of normal contract expenditures; and (c) reverted back from the F-16G to the F-16 C/D without a corresponding reduction in airframe price and total contract price.

69.    In April, 1986, following signature of the LOI, the United States Government approved the General Dynamics Contract and, based on representations as to how the money would be used, the release of FMS funds.

70.    That same month (April, 1986), defendant General Dynamics began receiving advance payments based on the LOI and the proposed attached contract, even before the final version of the contract was signed.

71.    Once General Dynamics received the advance payments, it put into effect its scheme to withdraw from its offset commitments and avoid the non-performance penalties.

72.    Specifically, by October, 1986, defendant General Dynamics had received over $80 million in advance payments. But -- having removed language in the March, 1985 LOI mandating its offset obligations and substituted language making the obligations discretionary – GD refused to finalize the offset agreements and introduced an allegedly "new" idea. Consistent with the scheme outlined in the January 24, 1983 memorandum discussed above at ¶63, defendant GD offered to establish and gradually capitalize jointly with Westinghouse and GE a "Greek" corporation known as HBDIC that would provide venture capital to develop businesses in Greece. General Dynamics' capital investments in HBDIC would count as offsets in lieu of its share of the initial offset commitments of approximately $850 million and related non-performance penalties.

73.    Under General Dynamics' new offset proposal, as set forth in Article 35 and in Annex U and AN of the 5/86 Contract, HBDIC would be capitalized with $50 million over a ten-year period to be provided by General Dynamics, GE, and Westinghouse, and the HAF would be offered an airframe co-production to be exercised by February 16, 1987, for $42,840,068.

16

74.     Consistent with the January 24, 1983 memorandum (*supra,* at ¶63), however, General Dynamics intended to (and did) use United States FMS funds (obtained by General Dynamics as part of the overpriced line items discussed in ¶¶103-04) *and* not General Dynamics' own funds to capitalize HBDIC. By doing so, General Dynamics acted in violation of FMS regulations and its contractual obligations.

75.     In January, 1987, the General Dynamics Contract was signed. The General Dynamics Contract (the "Contract") shows that the sale was based on the standard F-16 C/D configuration, and not the F-16 G, with only a few additional options. The final contract price, however, was not fully reduced to the level of the standard F-16 C/D configuration, but was inflated by approximately $150 million.

76.     The Contract was composed of 11 contract line items ("CLINs") and several options. The line items listed the price (i.e., cost plus profit) associated with each element of the Contract, such as the airframe, spare parts, depot maintenance, training, etc. Each CLIN total price was the product of Line Item unit prices multiplied by Line Item estimated quantities. The next section of this complaint describes how defendants improperly collected federal funds that were tied to the CLINs.

III. Defendants' unallowable collection and retention of federal funds.

> A.     Defendant General Dynamics falsely inflated the price
> paid by the United States for the F-16 airframe (CLIN 1).

76.     Defendant General Dynamics knowingly made, used, or caused to be made or used, false records or statements greatly inflating the cost of the Greek F-16 airframe and related equipment and services pursuant to the Contract in order to increase its profit and to create an excess pool of FMS funds to be used by General Dynamics for purposes not authorized for FMS funding under the F-16 Contracts. GD caused these false claims to be presented to and paid by the United States Government.

77.     Throughout the life of the F-16 project, and with every submitted modification, General Dynamics represented or caused to be represented to the federal government that its

17

price for 40 F-16 airframes would be between $438,000,000.00 and $444,750,655.00. These representations were made in the original Contract and in subsequent modifications submitted to the DSAA in April, 1988; September, 1990; March, 1993; March, 1996; and November, 1998 (modifications 1-5).

78.     The DSAA approved payment of federal FMS funds for the F-16 airframe based on General Dynamics' statements and representations about the airframe prices. But according to General Dynamics' own internal cost performance reports ("CPRs"), these stated prices were falsely inflated.

79.     By January, 1990, all 40 F-16 aircraft had been fully delivered by General Dynamics to Greece. In 1990 and 1993, General Dynamics represented to the federal government, in modifications 3 and 5, that the airframe price for the delivered 40 F-16 aircraft was $439,492,364.00. General Dynamics' CPRs, however, state that General Dynamics' total cumulative cost for the airframe was only $340,980.000.00 -- a difference of nearly $100 million.

80.     General Dynamics' CPRs also state that the total profit from the complete F-16 contract would be $74,164,000.00. Thus, even assuming that General Dynamics was entitled to obtain its full project profit of $74,164,000.00 from this single line item (CLIN 1, the airframe) on its multi-component F-16 Contract, General Dynamics' cost plus profit was approximately $415,000,000.00, or around $24,000,000.00 less than the $439,492,364.00 it had falsely claimed and collected in federal FMS funds.

81.     In sum, General Dynamics collected at least $24,000,000.00 of excess and fraudulently-obtained federal funds from the F-16 airframe.

82.     In addition, General Dynamics' CPRs show a line item for "co-production tooling" (line item 1900). By the end of July, 1991, General Dynamics' CPR shows cumulative costs of $20 million allocated to co-production tooling. But General Dynamics' pricing submissions to the Greek government throughout the contract negotiations show that General Dynamics' offered prices (i.e., cost plus profit) for the co-production tooling never

18

exceeded $2.5 million. Thus, General Dynamics' cost accounting carried approximately $17 million in fraudulently-inflated costs for co-production tooling.

### B. Defendant General Dynamics falsely billed the Government for depot maintenance (CLIN 10).

83. General Dynamics agreed to transfer expertise and assets to Greece so that depot-level maintenance on the F-16s could be performed in Greece. The depot program provided for depot-level (i.e., factory-level) maintenance ("DLM"), such as the testing, repairing, and overhauling of aircraft and aircraft components and sub-assemblies, including accessories, electronics, avionics, and engines. In the Contract, at Article 8, ¶¶8.1 and 8.2, General Dynamics committed (as set forth in CLIN 10), $49,887,435.00 to DLM. Under the Contract, the depot program was subject to "reassessment by the BUYER" not later than 12 months after the Contract effective date of April, 1986. If the buyer, i.e., Greece, chose to proceed with the depot program, the details were to be worked out in a "selection conference," and the program would include six components: (a) depot support equipment management; (b) depot support equipment; (c) depot spares administration and data management; (d) depot spares; (e) depot training; and (f) depot data. Contract Article 8, ¶8.11, and Annex C, D, W.

84. On September 9, 1990, more than four years after the Contract effective date, General Dynamics filed an amendment (modification 3) which increased CLIN 10 (DLM) to $52,905,300.00.

85. Between June 30, 1986 and August 27, 1990, General Dynamics caused to be submitted quarterly invoices to the United States accompanied by a certification that "contract milestones" had been met. The invoices sought lump-sum progress payments that were not tailored to specific work performance or product delivery requirements. The invoices provided, instead, that work on the contract was being performed and progressing according to the "milestone plan." While the invoices lack detail, it is evident that they include claims for DLM payment because (a) General Dynamics' September 8, 1986 projected annual-payment schedule includes DLM work to be performed for the years 1986-91; (b) Contract

modifications 2-4 include DLM in the total Contract price; and (c) the "tabulation sheets" submitted to the DSAA around March, 1993, as part of modification 4, purported to show that a substantial amount of DLM work had been completed.

86. Invoices caused to be submitted by General Dynamics to the DSAA and the DSAA case-disbursement printout show that General Dynamics was paid $625,652,626.25 by October 5, 1990. The entire Contract price, as of September 4, 1990, was $625,761,228.00 and it included $52,905,300.00 for DLM. Thus, of the more than $625,600,000.00 billed by, and paid to, General Dynamics, $52.9 million was for DLM.

87. However, by its own admission, General Dynamics/Lockheed performed only $822,000.00 in DLM work. This acknowledgement appears in Contract modification 6, at Article 8, ¶8.2, and Annex W, filed by General Dynamics/Lockheed on March 12, 1996. According to General Dynamics/Lockheed, the "depot program planning effort has been completed at the agreed-to price of $822,000.... Actual depot implementation was declined by the HAF, thus closing the depot contract line." In other words, General Dynamics had been paid $52,905,300.00 for DLM, but had delivered only $822,000.00 worth of DLM. Thus, General Dynamics falsely claimed and collected $52.1 million.

88. In a letter dated August, 1986, General John Marinakis, vice chief of the HAF, purported to advise General Dynamics that the depot program should not have been included in the Contract price and shown as a line item but, rather, should have been listed below the Contract price line as an option. On the surface, General Marinakis' position was consistent with the fact that, under the Contract, the depot program could not proceed until (a) Greece "reassessed" the program; and (b) a "selection conference" was convened. Both of these events, according to the Contract, were to take place within one year of the effective date of April, 1986. Nevertheless, General Dynamics included the full price of DLM on CLIN 10 and continued to claim and collect payments from the United States.

89. General Dynamics/Lockheed never advised the DSAA when "depot implementation was declined by the IIAF" or when the parties agreed on a final price for DLM

20

of $822,000.00. According to the Contract, however, this decision was to have been made by April, 1987 -- one year after the effective date. And the only document showing any DLM-related work is milestone no. 3, dated September 30, 1986, which includes "depot survey of Hellenic aerospace industry," contained in the Contract at Annex T. Thus, it is likely that the declination occurred by April, 1987. Regardless, General Dynamics/Lockheed knew, should have known, or recklessly disregarded the fact that the depot program was not being implemented by September, 1990, when it submitted modification 3, and certainly by the time it had submitted modification 4 (in March, 1993), which included an attachment purporting to show that CLIN 10 depot program requirements were at least 50% complete.

90.    In Contract modifications (dated March 18, 1993), General Dynamics/Lockheed claimed that it transferred $43,700,000.00 of unused DLM funds from CLIN 10 to a new line item (CLIN 15) for IECM integration. Three years later, in modification 6, defendants claimed that they were (a) reducing CLIN 15 to $43,440,000.00; and (b) creating an "unused CLIN 10 reserve fund credit" of $8,363,680.00. Those statements are false.

91.    First, as of March, 1993, when General Dynamics/Lockheed claims to have "transferred" $43.7 million from CLIN 10 to CLIN 15, it had already been paid $52.9 million for DLM that was never performed. Consequently, there were no funds remaining in CLIN 10 to transfer, and no funds had been refunded to the DSAA for the overpayment of DLM. Second, the purported transfer of funds from CLIN 10 to CLIN 15 cannot be viewed as a "credit" to be applied to IECM work because General Dynamics/Lockheed did not perform the IECM integration work free of charge but, instead, submitted invoices for and was paid the entire $43,440,000.00 between June, 1993 and November 23, 1996.

92.    In sum, General Dynamics/Lockheed knowingly submitted false claims in the amount of $52.1 million.

21

C.   General Dynamics falsely billed the Government for co-production
     (CLIN 12) and illegally diverted FMS funds to capitalize HBDIC.

93.    The Contract included an option for Greece to co-produce F-16 components in
its own manufacturing facilities. The option was priced at $42,840,068.00. The contract also
provided in Article 35, §35.2(a)(1) that the capitalization of HBDIC by GD, Westinghouse,
and GE was to be effectuated through the use of their own funds and in-kind contributions.
General Dynamics, as evidenced by the January 24, 1983 memo (*supra*, at ¶63), never had any
intention of complying with this contractual obligation.

94.    In February, 1987, Greece exercised the co-production option. When the option
was exercised, co-production became a separate line item (CLIN 12) in modification 2.

95.    By the time the co-production option was exercised, the original co-production
plan had been reduced to include only two airframe components, air inlets and aft fuselages.
Under the Contract, as part of co-production, General Dynamics would be paid for its
assistance in making the Greek manufacturing facility production ready. General Dynamics
would provide technical expertise, training, tooling, and coordinating support for Greece to co-
produce the two airframe components.

96.    In September, 1990, General Dynamics filed an amendment to the Contract,
modification 3, which increased CLIN 12 to $53,693,555.00.

97.    After the co-production option was exercised, General Dynamics submitted
separate quarterly invoices for co-production dated February 25, 1987 through August 27,
1990. The separate co-production invoices represented that work on co-production was
progressing and were accompanied by a "certificate of work in progress" stating that each
"progress payment requested was based on the contractor's satisfactory progress."

98.    According to the co-production invoices sent to the United States, by
September, 1990, General Dynamics' receipts for co-production had reached $47,693,487.00.

99.    The overwhelming bulk of the money collected from the United States
Government pursuant to the co-production invoices was not used for co-production.

100. General Dynamics knew that virtually no co-production was performed. In sworn statements, General Dynamics officials have acknowledged that money collected from the United States for co-production was never intended to be used for co-production but, instead, was intended to be used to capitalize HBDIC, which was owned and operated by defendant General Dynamics along with Westinghouse and GE as a profit-making venture.

101. In sum, the co-production invoices were false claims. The invoices sought money for specific co-production that was never performed and that General Dynamics never intended to perform.

102. General Dynamics has attempted to explain and legitimize its fraudulent allocation of tens of millions of dollars in co-production funds, but the explanations themselves are fraudulent. General Dynamics claims to have transferred the co-production funds to capitalize HBDIC. However, General Dynamics did not divert the co-production funds to capitalize HBDIC. First, according to General Dynamics' own cost documents, General Dynamics had already budgeted in the "main" Contract and set aside $33,000,000.00 for HBDIC as part of a $50,000,000.00 "management reserve." The management reserve was set up as a separate cost element apportioned across all the line items of the main F-16 Contract. Second, the commitment to capitalize HBDIC was undertaken by General Dynamics <u>before</u> the co-production option was even exercised and added to the contract as a CLIN charge. HBDIC had been planned as early as 1983 and incorporated in Article 35 of General Dynamics' original contract, while co-production was an option that was not even exercised until February, 1987 after the contract was signed. Third, General Dynamics' documents show that only $33,000,000.00 was used to capitalize HBDIC. Since the $33,000,000.00 used for General Dynamics' share of HBDIC capital came from General Dynamics' management reserve, General Dynamics cannot claim that any portion of the $47,693,487.00 collected for co-production (under CLIN 12) was used to capitalize HBDIC.

103. Furthermore, any diversion of co-production funds to HBDIC would have been itself illegal. HBDIC was a planned profit-making venture of General Dynamics, GE, and

Westinghouse. Federal regulations governing offsets prohibited the use of FMS funds for this type of profit-making venture. Even under subsequent changes to the regulations (much later - - in 1995) which arguably made allowable "costs to implement an offset agreement," the payments to capitalize HBDIC would have been illegal. As explained in the January 25, 1983 memo from Westinghouse to GD (¶63, supra ), such payments are an "investment" (i.e., expenditures for a corporate asset), and therefore do not qualify as a "cost." Finally, General Dynamic's contract, at Article 35, §35.2(a)(1), required General Dynamics, GE and Westinghouse to capitalize HBDIC with their own cash and in -kind contributions to the tune $50 million over a ten-year period.

104.   Proposed additional changes to the 1995 regulations were announced in a 1999 memorandum written by Eleanor Spector, the director of defense procurement of the Department of Defense. The proposed changes, written just five months before Ms. Spector joined defendant Lockheed as a vice president, would have loosened restrictions on military contractors, such as defendant contractors. Although Ms. Spector's proposed changes would have allowed the use of FMS funds for all offset costs, not just offset "implementation costs," defendant GD's capital investment in the profit-making company, HBDIC, does not qualify as a "cost" under any Government cost-accounting definition of that term.

105.   As it turns out, HBDIC never established any of the substantial offsets that defendant had proposed. Rather, at least part of the FMS funds were used to invest in Greek government bonds.

106.   Further, defendant GD together with Westinghouse and GE caused HBDIC funds to be used in self-dealing transactions by which defendant GD, Westinghouse and GE themselves ultimately received the FMS funds which had been diverted to HBDIC.

107.   HBDIC also "invested" in business ventures at highly-inflated values, sufficiently so that HBDIC auditors questioned several HBDIC transactions. For example, HBDIC made at least one unsecured loan of approximately $1 million to a Greek venture that was later written off as a bad debt a year later.

108.     A May, 1992 auditor's report states that HBDIC's investments in (a) Cibar, S.A., was overvalued by 233,000,000 drachmas (approximately $1.5 million); (b) Canard Dore, S.A., was overvalued by 148,248,500 drachmas (approximately $900,000.00); and (c) E-NA, S.A., was overvalued by 13,162,560 drachmas (approximately $80,000.00). These amounts were material in absolute terms and in relation to the true value of the investments.

109.     Businesses in which HBDIC invested have purchased technology and manufacturing licenses at greatly-inflated prices from defendant GD or its subcontractors.

### D.  Lockheed falsely billed the Government for IECM integration (CLIN 15).

110.     Beginning in March, 1993, as part of the fifth modification to the F-16 Contract, General Dynamics' successor, Lockheed, showed through a new contract line item (CLIN 15) that it would be performing $43,720,000.00 worth of work for integration and installation of the ASPIS IECM system in the original 40 F-16s. But this "new" task included a charge for the sale of integration kits for the IECM Group A provisions, which had already been included in the airframe price since January, 1987, and which had already been paid for with federal FMS funds.

111.     In addition, the "new" $43,720,000.00 task included a charge for "non-recurring" costs ($32,000,000.00) associated with integration study and design -- costs which, despite being represented as "non-recurring," were charged again by Lockheed in the follow-on F-16 contract for the sale of 40 additional aircraft. When the Integrated Electronic Counter Measure ("ICEM") integration task was individually priced in the earlier General Dynamics/Lockheed price proposals, as an F-16 "configuration and program option," the total price on 100 F-16 aircraft was $11 million.

112.     Since Lockheed charged twice for the "non-recurring" costs, it collected approximately $64 million on CLIN 15 for electronic warfare integration of the Greek ASPIS system. And since the actual price should have been $11 million, Lockheed inflated the IECM

25

billing by approximately $50 million and collected inflated prices from the United States Government through false claims.

113.    In addition, during the same month that Lockheed was submitting documents associated with a $43,720,000.00 "new" federal FMS-funded task, a consortium led by Litton signed a contract with Greece to handle all ASPIS work for Greek F-16s. From that point forward, Lockheed was requesting payment, and was paid federal FMS funds, for work that was purportedly being performed under a separate contract by a different contractor, Litton. Litton, the leader of a U.S. consortium which including Raytheon, received in March 1993 a contract to develop the ASPIS, an ICEM system, for installation and integration ccin the Greek F-16s. For the next several years, the federal government paid the double bills of both Lockheed and Litton.

E.      General Dynamics falsely billed the Government for spare parts (CLIN 3) and integrated logistic support ("ILS") (CLINs 2-9).

114.    In the initial F-16 Contract, at Annex C-1, General Dynamics included a false and knowingly-inflated price of $70,000,000.00 to provide spare parts for the F-16 aircraft. The quantities of spares associated with this price was for 60 aircraft, not 40. However, the $70,000,000.00 spares price was not reduced when the quantity of aircraft was reduced in the Contract from 60 aircraft to 40.

115.    The $70,000,000.00 price for spares included the spares for F-16 radar supplied by Westinghouse. General Dynamics knew that it would not be providing $70,000,000.00 worth of spares for the F-16. The Contract provided that by March 31, 1987, the final price for spares (listed in CLIN 3) would be decided upon after completion of a "spares selection conference." Before the spares selection conference (in March, 1987), Westinghouse signed a separate $12,000,000.00 contract with Greece to provide and deliver radar spares and radar depot level maintenance equipment for the F-16. Greece subsequently extended and increased the Westinghouse Contract to include $29,000,000.00 in F-16 radar spares. The Westinghouse Contract was separately financed with federal FMS funds.

26

116. Thus, as of March, 1987, the $70,000,000.00 price of spare parts listed in the General Dynamics Contract should have immediately been reduced by at least $12,000,000.00 (and as much as $29,000,000.00) to account for radar spares that had been originally priced in the General Dynamics Contract but subsequently moved under separate contract between Westinghouse and Greece.

117. General Dynamics, however, delayed in making any reduction in order to continue collecting inflated quarterly progress payments. On March 16, 1988, one year after the separate radar contract was signed, General Dynamics submitted or caused to be submitted, papers to the DSAA showing a reduction of only $1,000,000.00 (from $70,000,000.00 to $69,000,000.00), and after another two and one-half years, on September 9, 1990, General Dynamics submitted or caused to be submitted, a further reduction from $69,000,000.00 to $30,000,000.00 on CLIN 3. Between 1993 and 1996, the spare price was reduced another $6,000,000.00 to $24,000,000.00.

118. Accordingly, General Dynamics originally priced spare parts at $70,000,000.00, but ultimately delivered only $24,000,000.00 worth of spares. For three years, from 1987 to 1990, General Dynamics maintained an overall contract inflation of approximately $45,000,000.00 on CLIN 3 against which it was billing and collecting quarterly payments from the United States Government. From 1990 to December, 1992, General Dynamics continued to carry $6,000,000.00 in spare-parts inflation. Thus, General Dynamics obtained quarterly payment in excess federal FMS funds (and earned interest on the excess funds) that it knew it was neither authorized nor entitled to collect and retain. In addition, the United States Government was double billed for Westinghouse radar spare parts during much of this period.

F. Defendants' false claims carried forward with the sale of 40 additional F-16 aircraft (Peace Xenia II).

119. Defendants General Dynamics and Lockheed, in approximately late 1992, sold 40 additional F-16 aircraft to Greece. Upon information and belief, the cost and pricing data

27

used to negotiate this follow-on sale was based in whole or in part upon the costs and pricing data underlying the original sale. The prices for the second set of 40 F-16s were therefore also falsely inflated. As shown above, the cost and pricing data for the first sale was defective. The costs for the first 40 aircraft were falsely inflated (e.g., the duplication of the $32 million "non-recurring" charges for CLIN 15 IECM Integration). To the extent that the defective cost and pricing data was used in the negotiations for the follow-on sale, the prices for the second set of 40 F-16s were fraudulent.

IV.     The unallowable acceleration: defendants collected funds in advance
        of actual expenditures in violation of U.S. laws and regulations.

120.    Under the main Contract, defendant General Dynamics was entitled to receive quarterly advance progress payments triggered by quarterly progress milestones. To collect these staged progress payments, defendant General Dynamics was required to submit invoices which, according to DSAA specific instructions, had to reflect costs incurred and/or value of products delivered. In addition, these quarterly invoices had to be accompanied by the submission of certifications to the DSAA certifying that a contractually-designated milestone had been accomplished. All such certifications were to be signed by representatives of defendant General Dynamics and Greece.

121.    Since 1986, and perhaps until the late 1990s, defendant General Dynamics (and its successor, Lockheed) knowingly made, used, or caused to be made or used, false records, statements, and/or claims representing that particular contract milestones had been reached and work on all CLINs was progressing according to the delivery schedules. In fact, the progress-payment invoices were inflated over costs incurred or the value of products delivered, and work on the contract CLINs was not progressing according to the certified delivery schedules. These false claims were presented to and paid for by the United States Government.

28

A.  The progress-payment scheme.

122.    DSAA guidelines and regulations, FMS regulations, and the federal acquisition regulations prohibited progress payments to defendants in excess of expenditures on the F-16 project.

123.    Nonetheless, defendant General Dynamics requested and received quarterly progress payments on the sale of the F-16 to Greece that were in excess of contract expenditures and front loaded to provide General Dynamics with FMS funds before General Dynamics earned them.

124.    Prior to signing the final Contract on January 12, 1987, General Dynamics had received advanced payments of $80,649,106.00, a substantial portion of which represented payments in excess of expenditures. Ten days after contract execution, by January 22, 1987, General Dynamics had received $100,649,106.00. By October, 1988, General Dynamics had collected $517,347,183.00. At the end of 1988, General Dynamics had collected a total of $574,798,710.00 -- more than 90% of the Contract price -- before delivering a single F-16. On the other hand, as of January 12, 1987, General Dynamics' reported costs totaled only $10,863,000.00. By the end of 1988 (when General Dynamics had collected half a billion dollars), General Dynamics' total costs reported on its own CPRs were $278,298,000.00.

B.  Financial magnitude of progress-payment scheme.

125.    The financial magnitude of General Dynamics' progress-payment fraud is enormous. The F-16 Contract was composed of the cost and profit associated with a number of contract line items, including the airframe, spare parts, depot maintenance, and training. General Dynamics' progress-payment fraud was monumental even if defendant is credited with a series of unwarranted assumptions:

1.    that General Dynamics was entitled to payment of the entire contract profit of $74,164,000.00 (reflected in General Dynamics's December, 1992 CPR) up front by January, 1987, at contract execution, before it delivered a single aircraft;

2.    that General Dynamics was entitled to a separate cost provision, in an account called "management reserve," that grew to over $58,000,000.00

29

and which covered questionable items such as (1) "disallowed costs" ($3.4 million); (2) "indirect offset costs" ($6.4 million); and (3) capital investments in the "business development company" (HBDIC) ($33 million);

3.    that General Dynamics could legitimately charge and carry $27,157,000.00 for United States Government recoupment charges (according to GD's December, 1992 CPR) as part of its declared costs.[1]

126.    Even with these assumptions, by December, 1992 (when Lockheed acquired General Dynamics), General Dynamics had fraudulently obtained, as an absolute minimum, $86,131,164.00 of FMS funds.  This sum is the difference between the Government's total payments to General Dynamics ($653,799,164.00) and General Dynamics' costs ($493,504,000.00), plus stated profit ($74,164,000.00).  In addition, General Dynamics had obtained at least another $70,511,164.00 in imputed interest on excess FMS payments.  In total, the progress-payment scheme resulted in General Dynamics fraudulently securing at least $156,642,328.00 from the federal government.

C.  Acknowledgements of overpricing.

127.    In November, 1990, HAF Brigadier General Alexander Marangakis told relator that in his personal estimate, the F-16 Contract had been padded by at least $85,000,000.00.

128.    General Marangakis, one of the Greek officials appointed to the ad hoc committee formed to negotiate with General Dynamics, resigned in 1986 in protest against other Greek officials' attempts to release General Dynamics from its offset commitments.

129.    Around the same time, HAF Lieutenant Colonel Nicholas Dimitroulias told relator that General Dynamics and Greece overpriced the F-16 Contract by $50,000,000.00 and collected this sum from Greece's FMS funds in order to raise financing for the Greek industrial offset package.

---

[1] In truth, this sum should not have been included as a declared cost.  Under Article 8.3, ¶8.7 of the Contract, "Such amount is to be collected by the SELLER and paid to the U.S. Government and is not included in the Contract price nor is it included in the payment schedule."  General Dynamics collected the recoupment charges until May, 1991, when the United States Government granted Greece a "waiver" and forgave $22,950,000.00 that had already been collected and was supposed to be passed on to the federal government.

130.    Lt. Col. Dimitroulias was the principal financial officer member of the HAF's NFA negotiations committee from 1982-87, responsible for evaluating contract prices. Later, he was also responsible for certifying General Dynamics' periodic invoices so that they could be submitted to the DSAA for payment.

D.    Defendants' improper progress-payment scheme
      was planned far in advance of its implementation.

131.    General Dynamics conceived the fraudulent progress-payment scheme as early as 1982.

132.    In correspondence between General Dynamics executives dating from December, 1982, General Dynamics recognized that no FMS funds would be needed to cover the prepayment by Greece of contract-termination liability.

133.    General Dynamics was also told that "interest on FMS credits cannot be paid," and that it was impossible for it, or Greece, to collect and keep interest earned on FMS funds. Likewise, General Dynamics knew that the Government would not pay FMS funds "in excess of contract expenditures" and that any payment schedule which resulted in payments in excess of expenditures (e.g., a payment schedule that falsely included a termination-liability component) would result in "economic gain." Any such "economic gain" could not be retained by General Dynamics or Greece. It had to be returned to the United States.

134.    Nonetheless, General Dynamics understood that it would profit, in the form of interest, on a falsely-inflated FMS payment schedule. Indeed, General Dynamics anticipated as early as June 16, 1983 (as reflected in a memorandum of that date from D. Scheideman to G.D. Chairman David Lewis) that it could gain as much as $130,000,000.00 in interest on FMS funds using a payment schedule falsely padded to include termination liability.

135.    Accordingly, by June, 1983, General Dynamics was already constructing, in writing, a payment schedule for the F-16 Contract which was inflated to include the prepayment by Greece of termination liability. Termination liability would be covered, instead, by a Greek security bond.

31

136. General Dynamics, with certain HAF officers, prepared and presented the inflated contract payment schedule to the Greek government. To mislead the Greek government to accepting the schedule, General Dynamics (in collusion with and certain HAF officers) also prepared a draft contract which promised that any federal FMS funds obtained in excess of actual contract expenditures, as well as interest earned on the excess funds, would be offset by future economic price adjustments (i.e., price reductions) in the contract. The economic price adjustment schedule and the method of calculating the gained interest from the excess payments were contained in the draft contract, that was attached to the LOI signed with the Greek government in March 1985 and submitted to the DSAA, at Article 11, Part IV.

137. General Dynamics represented that the promised price adjustments would ultimately benefit the United States since a reduction in the contract price would mean the expenditure of fewer federal FMS funds on the F-16 project.

138. By May, 1986, General Dynamics and Greece had submitted to the DSAA, for FMS-funding approval, the draft contract appended to an LOI. General Dynamics had also certified to the DSAA since February 1986 that (a) its downpayments would not exceed costs, plus termination liability (which was zero), less profit; (b) there were no undisclosed side agreements; and (c) any reimbursements due under the contract would be paid back to the federal government. In reliance on these submissions, the DSAA approved funding in late March 1986.

139. Despite its representations to the DSAA that all amendments and modifications to the Contract would be disclosed, General Dynamics -- with the complicity of certain HAF officers but unbeknownst to the governments of Greece and the United States -- thereafter deleted the price adjustment schedule (Part IV of Article 11) from the final Contract.

140. In correspondence following the DSAA's funding approval (in May, 1986) and before the execution of the final version of the Contract (in January, 1987), the complicit HAF contracting officers knew that General Dynamics was intending to delete the price-adjustment schedule from the Contract. This knowledge is evidenced in memoranda from HAF General

32

Marinakis to V. Lee (dated 08/18/86) and from D. Lane Everett to G. Kostohryz (dated 09/16/86, ¶¶6-7). The HAF contracting officers purportedly requested that General Dynamics either reinsert the repayment schedule contained in Article 11, Part IV, or that the payment schedule in Annex AG of the Contract be adjusted to reflect that payments would be received in accordance with actual normal expenditures (as reflected in Annex AH, Table III, of the Contract).

140.    General Dynamics did neither. Instead, General Dynamics removed from the contract the price adjustment and repayment formula contained in Part IV of Article 11while the complicit HAF officers allowed the unsuspecting Greek government to accept and sign the Contract, which included the inflated, front-loaded payment schedule. For the next six years, General Dynamics secured federal FMS funds (a) far in excess of what it was entitled to receive; and (b) in derogation of statements and representations that it had made to the DSAA. After Lockheed acquired General Dynamics, it continued to receive the inflated payments.

141.    The payment-schedule fraud was massive. By January, 1987 (when the Contract was signed), General Dynamics had secured $100,649,096.00 in FMS funds but had cumulative deliveries of only $1,649,096.00. By December, 1992 (when Lockheed acquired General Dynamics), the excess funds plus interest totalled between $156,642,328.00 and $220,996,120.00. Given the enormity and egregiousness of the planned fraud, it is no surprise that HAF General Alexander Marangakis resigned before the Contract was signed.

V.  Concealment and retention of the unallowable profits:  violation of §3729(a)(7).

A.  Contract modification 3.

142    In March, 1990, General Dynamics submitted to the DSAA Contract modification 3. The modification, in violation of §3729(a)(7), served to "conceal and avoid" an obligation to transmit millions of dollars to the United States Government.

143.    Between 1989 and 1991, Greece had paid, and General Dynamics was holding, $29,047,706.00 in United States Government "recoupments." Recoupments are meant to

33

amortize the United States Government's development costs of the F-16 aircraft across all buyers. In other words, the recoupments collected from Greece would be the Greek government's prorated contribution towards F-16 development. In practice, recoupment charges are reflected below the contract line and not as an above-the-line charge. The payments are collected on behalf of the United States Government by the military contractor, i.e., General Dynamics, and then turned over to the federal government.

144.    In March, 1990, in modification 3, General Dynamics placed the $29,047,076.00 recoupment charge into the price of the Contract as a new, above-the-line item (CLIN 14). General Dynamics knew, or should have known, that this amounted to false billing. The Contract specifically required General Dynamics to keep recoupment charges below the Contract price line: "Such amount is to be collected by the SELLER and paid to the U.S. Government and is not included in the Contract price nor is it included in the payment schedule." Art. 8-3, ¶8.7.

145.    Placing $29,000,000.00 into CLIN 14 in modification 3 enabled General Dynamics to retain, in violation of §3729(a)(7), the inflated Contract price and to conceal its fraudulent overbilling.

B.  Contract modification 5.

146.    In March, 1993, Lockheed submitted to the DSAA modification 5. The modification, in violation of §3729(a)(7), served to "conceal and avoid" an obligation to transmit millions of dollars to the United States Government.

147.    Modification 5 continued to reflect CLIN 14, the improper $29 million recoupment charge.

148.    Lockheed knew that CLIN 14 did not belong in the Contract. In fact, by March, 1993, $22,950,000.00 of that amount no longer existed as a United States Government recoupment charge. In 1991, as it frequently does, the United States waived all recoupment charges related to the F-16 Contract. General Dynamics had already collected the recoupment

34

funds and returned them to the FMS trust account by issuing a check payable to the United States. The United States Government in turn granted these funds to Greece by placing them back into Greece's FMS escrow account.

149.    Lockheed nevertheless retained $29,000,000.00 in CLIN 14 as a contract charge in modification 5. This enabled Lockheed to continue to retain, in violation of §3729(a)(7), the total inflated Contract price and to conceal its overbilling.

C.    Contract modification 6.

150.    In August, 1994, relator, with counsel, meet with the federal government to share evidence of defendants' violations of the FCA. In 1995, relator's counsel had already submitted FOIA requests for the release of various documents related to the F-16 project. Defendants were notified of relator's FOIA petitions and did two things to keep the federal government off their track.

151.    First, defendants attempted to prevent relator from receiving any F-16 documents pursuant to the FOIA.

152.    Second, in January, 1996, Lockheed began preparing modification 6. The modification was executed on March 12, 1996 and purported to provide the federal government a credit of $29,926,515.00 for "work not performed and from cancellation of reserve money for spares." On its face, the modification appears to be a confession by Lockheed that General Dynamics and Lockheed had received funds to which they were not entitled, and an attempt to return improper billings. In reality, however, modification 6 masked defendants' much larger fraud. By the time of the modification, Lockheed and General Dynamics had already received between $200,000,000.00 and $220,000,000.00 in excess federal FMS funds, including interest.

153.    Lockheed's $30,000,000.00 remittance to the federal government was a reverse false claim. In derogation of statutory prohibitions, Lockheed knowingly used false records (in papers related to modification 6) "to conceal, avoid, and decrease its obligation to pay or

35

transmit" tens of millions of dollars "to the United States Government" in connection with the sale of the F-16 fighter aircraft to Greece. See 31 U.S.C. §3729(a)(7).

V. The legal counts.

    A. Count I: violation of the FCA through airframe price inflation.

    154. The allegations of the preceding paragraphs are realleged as if fully set forth herein.

    155. Defendant General Dynamics knowingly made, used, or caused to be made or used, false records or statements greatly inflating the cost of the Greek F-16 airframe and related equipment and services pursuant to the F-16 Contract in order to increase its profits and to create an excess pool of FMS funds to be used by defendants for unauthorized purposes ("F-16 airframe-price-inflation scheme"). These false claims were presented to and paid by the United States Government.

    156. By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, and in connection with the F-16 airframe-price-inflation scheme, knowingly presented, or caused to be presented, to officers, agents, or employees of the Government, false claims for payment or approval under the Contract which was paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(1).

    157. By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, in connection with the F-16 airframe-price-inflation scheme, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government under the Contract which was paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(2).

    158. The United States Government relied on the false records, statements, and/or other claims made and presented or caused to be presented by defendant General Dynamics

and, in reliance on the accuracy thereof, paid defendant General Dynamics, from the FMF Greek escrow account, inflated amounts and for uses not authorized for FMS funding.

159.   As a result of defendant's false certifications, representations, and false claims, the United States Government has been damaged in substantial amounts to be determined at trial.

### B. Count II: violation of the FCA through depot maintenance billings.

160.   The allegations of the preceding paragraphs are realleged as if fully set forth herein.

161.   Defendant General Dynamics knowingly made, used, or caused to be made or used, false records or statements representing that defendant General Dynamics would supply equipment and services in order to provide Greece with DLM capabilities for the F-16 when, in fact, defendant never provided a substantial amount of such equipment and services, and Greece was never provided the DLM capabilities (the "DLM scheme"). These false claims were presented to and paid by the United States Government.

162.   By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, and in connection with the DLM scheme, knowingly presented, or caused to be presented, to officers, agents, or employees of the Government, false claims for payment or approval under the GD Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(1).

163.   By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, in connection with the DLM scheme, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(2).

164.    The United States Government relied on the false records, statements, and/or other claims made and presented by defendant General Dynamics and, in reliance on the accuracy thereof, paid defendant General Dynamics, inflated amounts and for uses not authorized for FMS funding.

165.    As a result of defendants' false certifications, representations, and claims, the United States Government has been damaged in substantial amounts to be determined at trial.

C.   Count III:  violation of the FCA through co-production and HBDIC billings.

166.    The allegations of the preceding paragraphs are realleged as if fully set forth herein.

167.    Defendant General Dynamics devised and implemented a scheme by which it was able to improperly divert FMS funds to cover its offset obligations and non-performance penalties (the "HBDIC scheme").  FMS regulations and General Dynamics' Contract prohibited the use of FMS funds to satisfy indirect offset obligations or non-performance penalties.

168.    Defendant General Dynamics knowingly made, used, or caused to be made or used, false records or statements representing that defendant General Dynamics would perform, and was performing, co-production tasks when, in fact, defendant General Dynamics never provided a substantial amount of co-production (the "co-production scheme").  These false claims were presented to and paid by the United States Government.

169.    By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, and in connection with the HBDIC scheme and the co-production scheme, knowingly presented, or caused to be presented, to officers, agents, or employees of the Government, false claims for payment or approval under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(1).

38

170. By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, in connection with the HBDIC scheme and the co-production scheme, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(2).

171. The United States Government relied on the false records, statements, and/or other claims made and presented by defendant General Dynamics and, in reliance on the accuracy thereof, paid defendant, inflated amounts and for uses not authorized for FMS funding.

172. As a result of General Dynamics' false certifications, representations, and false claims, the United States Government has been damaged in substantial amounts to be determined at trial.

D. Count IV: violation of the FCA through IECM integration billings.

173. The allegations of the preceding paragraphs are realleged as if fully set forth herein.

174. Defendants General Dynamics and Lockheed knowingly made, used, or caused to be made or used, false records or statements surrounding the IECM integration (the "IECM integration scheme"). These false claims were presented to and paid by the United States Government.

175. By virtue of the acts described above, defendants General Dynamics and Lockheed, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, and in connection with the IECM integration scheme, knowingly presented, or caused to be presented, to officers, agents, or employees of the Government, false claims for payment or approval under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(1).

39

176. By virtue of the acts described above, defendants General Dynamics and Lockheed, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, in connection with the IECM integration scheme, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government under the General Dynamics Contract which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(2).

177. The United States Government relied on the false records, statements, and/or other claims made and presented by defendants General Dynamics and Lockheed and, in reliance on the accuracy thereof, paid defendants General Dynamics and Lockheed, inflated amounts and for uses not authorized for FMS funding.

178. As a result of defendants' false certifications, representations, and false claims, the United States Government has been damaged in substantial amounts to be determined at trial.

E. Count V:  violation of the FCA through spare-parts billings.

179. The allegations of the preceding paragraphs are realleged as if fully set forth herein.

180. Defendants General Dynamics and Lockheed knowingly made, used, or caused to be made or used, false records or statements surrounding the supply of spare parts for the F-16 project (the "spare-parts scheme").  These false claims were presented to and paid by the United States Government.

181. By virtue of the acts described above, defendants General Dynamics and Lockheed, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, and in connection with the spare-parts scheme, knowingly presented, or caused to be presented, to officers, agents, or employees of the Government, false claims for payment or approval under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(1).

40

182.    By virtue of the acts described above, defendants General Dynamics and Lockheed, by and through their divisions, subsidiaries, affiliates, officers, agents, and employees, in connection with the spare-parts scheme, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(2).

183.    The United States Government relied on the false records, statements, and/or other claims made and presented by defendants General Dynamics and Lockheed and, in reliance on the accuracy thereof, paid defendants General Dynamics and Lockheed, inflated amounts and for uses not authorized for FMS funding.

184.    As a result of defendants' false certifications, representations, and false claims, the United States Government has been damaged in substantial amounts to be determined at trial.

F.  Count VI:  violation of the FCA through progress-payment scheme.

185.    The allegations of the preceding paragraphs are realleged as if fully set forth herein.

186.    Defendant General Dynamics knowingly made, used, or caused to be made or used, false records or statements certifying that work on all CLINs was progressing according to the delivery schedules and that invoices reflected cost incurred and/or the value of the product delivered when, in fact, this was not true (the "progress-payment scheme"). These false claims were presented to and paid by the United States Government.

187.    By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, and in connection with the progress-payment scheme, knowingly presented, or caused to be presented, to officers, agents, or employees of the Government, false claims for payment or

41

approval under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(1).

188. By virtue of the acts described above, defendant General Dynamics, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, in connection with the progress-payment scheme, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government under the General Dynamics Contract, which were paid for with FMS funds, in violation of 31 U.S.C. §3729(a)(2).

189. The United States Government relied on the false records, statements, and/or other claims made and presented by defendant General Dynamics and, in reliance on the accuracy thereof, paid defendant General Dynamics, inflated amounts and for uses not authorized for FMS funding.

190. As a result of defendants' false certifications, representations, and false claims, the United States Government has been damaged in substantial amounts to be determined at trial.

G. Count VII: violation of the FCA through commission of reverse false claims.

191. The allegations of the preceding paragraphs are realleged as if fully set forth herein.

192. Defendants General Dynamics and Lockheed knowingly made, used, or caused to be made or used, false records or statements surrounding modification 3, modification 5, and modification 6 to the General Dynamics Contract (the "reverse-false-claim scheme"). These false claims were presented to and paid by the United States Government.

193. By virtue of the acts described above, defendants General Dynamics and Lockheed, by and through its divisions, subsidiaries, affiliates, officers, agents, and employees, and in connection with the reverse-false-claim scheme, knowingly made, or caused to be made, and used, to officers, agents, or employees of the Government, false records and

42

statements to conceal, avoid, and decrease their obligation to pay and/or transmit millions of dollars to the United States Government, in violation of 31 U.S.C. §3729(a)(7).

194.    The United States Government relied on the false records, statements, and/or other claims made and presented by defendants General Dynamics and Lockheed and, in reliance on the accuracy thereof, paid defendants General Dynamics and Lockheed, through the Government of Greece, inflated amounts and for uses not authorized for FMS funding.

195.    As a result of defendants' false certifications, representations, and false claims, the United States Government has been damaged in substantial amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Dimitri Yannacopoulos, on behalf of himself and the United States Government, prays that:

1.    this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained, plus a civil penalty of $10,000.00 for each violation of 31 U.S.C. §3729;

2.    relator be awarded the maximum amount allowed pursuant to §3730(d) of the FCA;

3.    relator be awarded all reasonable attorneys' fees, costs, and expenses;

4.    the Court award prejudgment and post-judgment interest; and

5.    the United States and relator receive all other relief, both at law and at equity, to which they are entitled.

Respectfully submitted,

Judson H. Miner
One of the Attorneys for Plaintiff-Relator

Bradley S. Weiss
One of the Attorneys for Plaintiff-Relator

Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170

Law Office of Bradley S. Weiss
268 Leonard Wood S., #205
Highland Park, IL 60035
(847) 681-9090

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 22, 2003, a copy of the foregoing **SECOND AMENDED COMPLAINT** was served upon counsel named below, by U.S. mail.

Gerald F. Kaminski, Esq.
Assistant United States Attorney
 for the Southern District of Ohio
Suite 400, Atrium 2
221 East Fourth Street
Cincinnati, Ohio 45202

Michael F. Hertz, Esq.
Alan Kleinburd, Esq.
David Sadoff, Esq.
Civil Division
U.S. Department of Justice
Post Office Box 261
Washington, D.C. 20044

Linda A. Wawzenski, Esq.
Deputy Chief for the Civil Division
United States Attorney for the Northern District of Illinois
219 South Dearborn Street
Chicago, IL  60604

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**FILED**

MAY 0 6 2003

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

| | | |
|---|---|---|
| SUPPRESSED, | ) | CIVIL ACTION NO. C-1-96-456 |
| | ) | |
| Plaintiffs, | ) | Judge Thomas M. Rose |
| | ) | Magistrate Judge Michael K. Merz |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| SUPPRESSED, | ) | FILED UNDER SEAL |
| | ) | PURSUANT TO |
| Defendants. | ) | 31 U.S.C. §3730(b)(2) |

## QUI TAM RELATOR'S SECOND AMENDED COMPLAINT

1. Relator's counsel, Judson H. Miner, and the law firm of Miner, Barnhill & Galland, 14 W. Erie Street, Chicago, IL 60610, hereby present the attached Second Amended Complaint for filing in camera and under seal pursuant to 31 U.S.C. §3730(b)(2).

2. Unless otherwise ordered by the court, the matter shall remain restricted for the period specified 31 U.S.C. §3730(b)(2).

Judson H. Miner
One of Relator's counsel

Miner, Barnhill & Galland, P.C.
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170

**DOCKETED**

MAY 6 2003