# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **03 C 3012** | **DATE** | April 27, 2004 |
| **CASE TITLE** | USA ex rel Yannacopolous v General Dynamics, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Hearing

(5) ■ Status hearing set for 5/13/04, at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

Memorandum opinion and order entered. Accordingly, defendants' motions to dismiss and motion for summary judgment are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | Document Number |
| X | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | APR 28 2004 | |
| | Mail AO 450 form. | docketing deputy initials | 103 |
| | Copy to judge/magistrate judge. | | |
| GS | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, ex rel., )
DIMITRI YANNACOPOLOUS, )
                                  )
      Relator-Plaintiff, )
                                  )      No.     03 C 3012
   v. )
                                    )      Judge Robert W. Gettleman
GENERAL DYNAMICS and LOCKHEED )
MARTIN CORPORATION, )
                                    )
      Defendants. )

## MEMORANDUM OPINION AND ORDER

In his second amended complaint, relator-plaintiff, Dimitri Yannacopolous ("relator"), a former General Dynamics employee, alleges that defendants General Dynamics and Lockheed Martin Corporation ("GD" and "Lockheed") violated the False Claims Act, 31 U.S.C. §3279 ("FCA") by submitting false claims in connection with F-16 fighter aircraft sales to Greece. Defendants, in separate motions, have moved to dismiss the second amended complaint, arguing: (1) the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) or, alternatively, Fed. R. Civ. P. 12(b)(6);[1] and (2) plaintiff fails to plead fraud with particularity as required by Fed. R. Civ. P. 9(b).[2] For the reasons stated below, the court denies defendants' motions to dismiss in their entirety.

DOCKETED
APR 2 8 2004

_____

[1]Lockheed joins GD's Memorandum in Support of its Motion to Dismiss under Rules 12(b)(1) and 12(b)(6).

[2]GD joins Lockheed's Memorandum in Support of its Motion to Dismiss under Rule 9(b).

# FACTS[3]

According to plaintiffs' second amended complaint, relator is a Greek citizen and consultant. During all times relevant to this action, defendant GD, through its Fort Worth Division, was the leading U.S. contractor in the development, manufacture, assembly and sales of F-16 fighter aircraft and support services to the U.S. and foreign governments. In 1978, the Greek government began "shopping" for fighter jets, ultimately electing to purchase 40 F-16s. In 1985, Greece signed a letter of intent ("LOI") to purchase 40 F-16s from GD. GD and Greece entered into a final contract in January 1987. Defendant Lockheed purchased the Fort Worth Division from GD effective at the end of February 1993, and is alleged by relator to be GD's successor in interest to all of GD's F-16 business, including the Greek contract.

Pursuant to a 1979 written consulting agreement with GD, relator assisted GD in its efforts to persuade the Greek government to select the F-16. That agreement expired in October 1983, and was not renewed. After 1983, relator had no further involvement in efforts to sell the F-16 to Greece.

U.S. taxpayer funds financed the F-16 sales. The Foreign Military Sales Financing Program ("FMS") established by the Arms Control Export Act, 22 U.S.C. §2751 (the "Act") authorizes sales of American military equipment from the U.S. Government to foreign allies. The Act allows the U.S. to provide loans, subsidized loans and grant funds to foreign allies so that they can purchase American military equipment directly from the manufacturer. Using FMS funds, the Greek government purchased the F-16s directly from GD.

---

[3]The facts are taken from plaintiff's complaint and accepted as true for the purposes of the pending motions.

Pursuant to the Act, GD submitted the LOI to the Defense Security Assistance Agency ("DSAA")[4] for approval of the contract terms. In February 1986, GD submitted a signed contractor's certification to the DSAA. As a manufacturer selling military equipment to a foreign government under the FMS program, GD was required to meet certification requirements, guidelines and restrictions as monitored by the DSAA. GD was also required to submit the final contract for DSAA approval. GD was further required to provide Greece with DSAA invoices, quarterly waybills and DD250[5] forms for each payment claim. In turn, DSAA relied on those documents when releasing FMS funds. GD began receiving FMS funds as soon as the LOI and mutually agreed draft contract received U.S. Government approval in April 1986. The contract was finalized in January 1987, and contained 11 contract line items ("CLINs") that specified the price for each part of the contract (airframe, spare parts, post-sale maintenance, etc.) After the final contract, GD (then Lockheed) submitted at least seven contract modifications stating adjustments to the CLINs.

Relator alleges that GD engaged in various fraudulent conduct to obtain the F-16 contract with Greece.[6] However, that initial fraud is not the subject of this suit. The initial fraud was the

---

[4]Today known as the Defense Security Cooperation Agency.

[5]According to the second amended complaint, a DD250 form is "required by the contract to support every claim for payment upon which the DSAA relied in releasing funds."

[6]The initial fraud allegedly involved a scheme whereby GD proposed the sale of a non-existent F-16G, which was supposed to be of a much higher quality than the existent F-16C/D. The purpose was to convince Greece that there was an F-16 competitive with other, superior fighter jets on the market. GD allegedly stated a significantly higher price for the F-16G. However, once GD was assured of landing the contract, it substituted the F-16C/D, while still charging the inflated price. In other words, GD invented a non-existent, more expensive, higher performance jet, but then delivered an existing basic jet at the higher performance jet cost; a "bait and switch."

subject of Greek proceedings commenced in 1989 when a new political party took control. The new party was in opposition to the party that held control during the F-16 negotiations. In parliamentary and criminal proceedings ("the Greek Proceedings"), the new Greek government investigated allegations that it was duped into overpaying for the F-16s. The Greek Proceedings were well publicized in Greece, but minimally reported in the U.S. The Greek Proceedings contained no allegations of fraud committed against the U.S. government, and were conducted under seal and, of course, in Greek. In 1992, the Greek Proceedings concluded with a determination that no wrongdoing occurred in connection with the sale. Thereafter, Greece purchased more F-16s from GD.

Approximately six months after the Greek Proceedings commenced, in 1989, relator sued GD in the United States District Court for the District of Columbia, later transferred to the Eastern District of Missouri. No. 91-324C-8 (DJS); aff'd Yannacopolous v. General Dynamics Corp., 75 F.3d 1298 (8th Cir. 1996). In that suit ("Yannacopolous I"), relator alleged: (1) a personal claim for approximately $50,000,000 in commissions from the F-16 sale; and (2) three RICO counts. Relator partially supported his RICO counts with facts relating to the F-16 fraud scheme alleged in the Greek Proceedings. In the course of the Yannacopolous I proceedings, and pursuant to the Freedom of Information Act ("FOIA"), relator obtained much information regarding GD's F-16 sales. In August 1994, the court granted GD's motion for summary judgment on relator's RICO counts, finding that he was not directly injured by the alleged fraud. In November, the court ruled against relator on his remaining claims.

The fraud alleged in the instant suit differs from the fraud alleged in the Greek Proceedings and Yannacopolous I, by alleging overbilling subsequent to the initial contract, and

4

by naming the U.S. (not Greece) as the victim. Due to various overbilling strategies and improper conduct in making FMS claims, relator alleges that defendants defrauded the U.S. government of hundreds of millions of dollars. The Greek Proceedings and Yannacopolous I focused on facts pertaining to the initial F-16G bait and switch allegations as affecting Greece, not to subsequent fraudulent activity alleged in relator's second amended complaint that affected the U.S. Government.

On April 23, 2003, relator filed his second amended complaint against defendants, seeking: damages in an amount equal to three times the amount of damages sustained by the U.S. Government; a civil penalty for each violation of 31 U.S.C. §3729; the maximum award allowed by 31 U.S.C. §3730(d); attorneys' fees, costs and expenses; and prejudgment and post-judgment interest.[7] Relator's Second Amended Complaint contains seven counts of FCA violations through submissions of false claims.

In Count I, relator claims that GD knowingly submitted false records, statements and claims to the DSAA, collecting at least $24,000,000 of excess, fraudulently-obtained funds in connection with the F-16 airframe. In Count II, relator claims that GD knowingly submitted false records, statements and claims to the DSAA, collecting $52,100,000 of excess and fraudulently obtained funds in connection with depot-level maintenance. In Count III, relator claims that GD knowingly submitted false records, statements and claims to the DSAA to collect $47,693,487 of excess and fraudulently obtained funds in connection with co-production that was never

---

[7]This action was first filed in the United States District Court of Ohio, Western Division under seal in 1996, pursuant to 31 U.S.C. § 3730(b)(2), and unsealed on June 3, 2003, after the government declined to pursue the case. This case was reassigned to this court on September 9, 2003.

performed (allegedly, GD capitalized a Greek business entity known as HBDIC to co-produce F-16 parts, although no co-production was performed).

In Count IV, relator claims that Lockheed knowingly submitted false records, statements and claims to the DSAA to collect $54,000,000 for Integrated Electronic Measure Counter work, but that only $11,000,000 of that work was actually performed. Count V alleges that GD knowingly submitted false records, statements, and claims to collect excess and inflated amounts of $45,000,000 and $6,000,000. In Count VI, relator claims that GD failed to disclose to the U.S. Government that it deleted a price adjustment schedule between the LOI and final contract dates. By failing to make the adjustments, GD knowingly submitted false documents, including inflated quarterly progress payment invoices, that withheld between $156,642,328 and $220,996,120 of excess funds owed to the U.S. Government.

In Count VII, relator alleges that Lockheed modified the contract to include a $29 million charge owed to the U.S. Government for recoupment of certain funds from Greece, but that Lockheed returned the money above-the-line, thus inflating the contract and price and not really returning the $29 million. Further, relator alleges that Lockheed kept the one-time recoupment cost above-the-line in subsequent years, thus inflating the overall contract price.

## DISCUSSION

### I. FED. R. CIV. P. 9(b)

Defendants have moved pursuant to Fed. R. Civ. P. 9(b), arguing that relator fails to plead fraud with particularity. False Claims Act complaints must be pled with particularity. United States ex rel. Garst v. Lockheed-Martin Corp., 328 F.3d 374, 375-377 (7th Cir. 2003); United States ex rel. Robinson v. Northrop Corp., 149 F.R.D. 142, 144-145 (N.D. Ill. 1993). Three

primary policies support Rule 9(b)'s requirement that fraud be pled with particularity: "(1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1327 (7th Cir. 1994)(quoting Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 777 (7th Cir. 1994). To satisfy these policies, Rule 9(b) requires that "the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990). Rule 9(b) does not require that plaintiff explain his entire case, only that he state the actions that allegedly constitute fraud. Midwest Commerce Banking Co. v. Elkhart City Ctr., 4 F.3d 521, 524 (7th Cir. 1993).

Defendants argue that relator failed to plead the "who, what, when, where and how" of the alleged fraudulent claims. In arguing a failure to plead "who," defendants note relator's failure to identify the specific employees of GD or Lockheed responsible for inflating claims. Those details, however, are in the exclusive possession of defendants, and relator need not allege them under Rule 9(b). See Winthrop Resources Corp. v. Lacrad Int'l Corp., 2002 WL 24248, *2 (N.D. Ill. 2002)(citing Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1051 (7th Cir. 1998)). Relator ceased working for GD in 1983 and never consulted with Lockheed. It is not possible for relator to know beyond mere speculation "who" was responsible for the alleged fraudulent claims because that is inside information within defendants' exclusive control.

Defendants argue that relator fails to plead "what" fraudulent activity occurred, because relator's allegations do not cite "actual 'false claims'" and thus cannot support an inference of fraud. Relator sufficiently pleads numerous allegations of "what" defendants did to defraud the

7

United States. Each of the seven counts alleges inflated charges to the U.S. Government. Obviously, overbilling a client for products and services that were never delivered or performed may constitute fraudulent activity.

Next, defendants argue that relator fails to identify the specific dates "when" the fraudulent activity occurred. Defendants focus on the dates of specific claims, whereas relator focuses on the dates of activity that allegedly caused the claims to be fraudulent. Relator pleads specific dates regarding contract submissions and modifications, as well as specific timeframes during which defendants submitted allegedly fraudulent quarterly invoices for payment. The complaint thus sufficiently informs defendants when the fraudulent activity occurred. Requiring greater specificity of claim dates is unnecessary.

Defendants rely on Garst v. Lockheed Integrated Solutions Co., 158 F.Supp.2d 816, 821 (N.D. Ill. 2001), in which the district court dismissed the complaint for, among other things, failing to plead specific dates. After the dismissal, plaintiff amended his complaint, but the court again dismissed, with prejudice, for, among other things, failing to plead specific dates. Garst v. Lockheed-Martin Corp., 2002 U.S. Dist. LEXIS 14307, *8-10 (N.D. Ill. 2002). The Seventh Circuit's affirming opinion, however, clearly shows that the plaintiff's complaints were deeply flawed for each factor of the "who, what, when, where and how" requirements, not just lack of specific dates. Garst v. Lockheed-Martin Corp., 158 F. Supp. 2d at 822-23; U.S. v. Lockheed-Martin Corp., 328 F.3d 374 at 376-379 (7th Cir. 2003).

Defendants' reliance on Midwest Grinding Co., Inc. v. Spitz, 976 F. 2d 1016, 1020 (7th Cir. 1992), is also misplaced because, in the instant case, unlike in Midwest, defendants, rather than plaintiffs, are in possession of the actual claims alleged to be false. In Midwest, it was the

8

plaintiffs that had access to the allegedly fraudulent invoices. "Midwest, not the defendants, had peculiar access to the invoices on which the undercharging scheme was based: Spitz sent those invoices while employed at Midwest and Midwest presumably retained those business records." Id. at 1020. In the instant case, relator's relationship with GD ended long before any claims were submitted. Consequently, his knowledge of specific dates is limited, although he has nonetheless pled some such dates. Accordingly, relator's complaint sufficiently pleads "when" the allegedly fraudulent claims occurred.

Defendants also argue that relator insufficiently pleads "where" the alleged false claims were made. Relator pleads that the false claims were made in essentially three places: GD's various facilities, Greek Government facilities, and U.S. Government facilities (specifically the DSAA). Any greater specificity in the complaint would undermine the purpose of Fed. R. Civ. P. 8 notice pleading, which must be read in conjunction with Rule 9(b). Garst, 328 F.3d at 376. Length and grueling exaction is not the purpose of Rule 9(b). Id. If anything, relator's complaint is longer and more detailed than Rule 9(b) requires. The 7th Circuit analogized the Rule 9(b) "who, what, when, where and how" requirement to the information contained in the "first paragraph of a newspaper story." DiLeo, 901 F.2d at 627. The first paragraph of a newspaper story is short and to the point. Relator's complaint also cuts to the point. The policies of Rule 9(b) are served because defendants have sufficient notice of the fraud alleged against them and relator alleges enough particular facts to foreclose fears of a fishing expedition. Consequently, the second amended complaint alleges FCA fraud with sufficient particularity as required by Rule 9(b).

## II. FED. R. CIV. P. 12(b)(1) - FED. R. CIV. P. 12(b)(6) - FED. R. CIV. P. 56

Defendants have also moved to dismiss relator's second amended complaint pursuant to

Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction or, alternatively, Fed. R. Civ. P.

12(b)(6), for failure to state a claim upon which relief can be granted. In support of their

jurisdictional motion, defendants argue that relator cannot prove by a preponderance of the

evidence that the court has jurisdiction under FCA §§3730(e)(4)(A)&(B), which provide:

> (A) No court shall have jurisdiction over an action under this section based upon
> the public disclosure of allegations or transactions in a criminal, civil, or
> administrative hearing, in a congressional, administrative, or Government
> [General] Accounting Office report, hearing, audit, or investigation, or from the
> news media, unless the action is brought by the Attorney General or the person
> bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an individual who has
> direct and independent knowledge of the information on which the allegations are
> based and has voluntarily provided the information to the Government before
> filing an action under this section which is based on the information.

Defendants' reliance on Rule 12(b)(1) is misplaced. Sections 3730(e)(4)(A)&(B) are

matters of substantive law, not a "jurisdictional bar" as suggested by some courts. United States

ex rel. Feingold v. AdminaStar Fed., Inc., 324 F.3d 492, 494-95 (7th Cir. 2003)(citing

Hughes Aircraft Co. v. United States, 520 U.S. 939, 950-51 (1997).[8] See also, United States ex

rel. Fallon v. Accudyne Corp., 97 F.3d 937, 940-941 (7th Cir. 1996)(stating,

"[§3730(e)(4)(A)&(B) do] not curtail the categories of disputes that may be resolved (a real

'jurisdictional' limit) but instead determines who may speak for the United States on a subject,

and who if anyone gets a financial reward. 'Jurisdiction' is a notoriously plastic term."). In

---

[8]In Feingold, the Seventh Circuit acknowledged that, in prior cases, the court discussed
§ 3730(e)(4)(A) as a "jurisdictional bar," but that it now follows the 1997 Supreme Court
decision in Hughes, which held that § 3730(e)(4)(A) compliance is an issue of substantive law.

§3730 actions, subject matter jurisdiction is actually conferred by §§1331, 1345, and 3732(a) rather than §3730(e)(4)(A)&(B). Id. at 941. Accordingly, the court has subject matter jurisdiction over the dispute.

In support of their Rule 12(b)(6) motion, defendants argue that relator fails to satisfy the requirements of §3730(e)(4) because: (1) his suit is based on public disclosures of the instant allegations or transactions; and (2) he is not an "original source" of the information contained in the public disclosures. 31 U.S.C. §3730(e)(4)(A)&(B). In support of their motion, defendants attached numerous exhibits that contain matters outside the pleadings which the court cannot consider under Rule 12(b). Rule 12(b) states:

> If, on a motion asserting the defense number (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.

Whether to convert a Rule 12(b)(6) motion into a motion for summary judgment, as allowed by Rule 12(b), is a matter of discretion for the court. Levenstein v. Salafsky, 164 F.3d 345, 347-48 (7th Cir. 1998). All parties agree, however, to conversion to a motion for summary judgment under Rule 56 and disclaim the need for further discovery. Accordingly, the court construes the Rule 12(b)(6) motion as a motion for summary judgment.

Under Fed. R. Civ. P. 56, a movant is entitled to summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When

considering a motion for summary judgment, the court draws all reasonable inferences in the light most favorable to the non-moving party. Fisher v. Transco Services.-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

Defendants argue that relator has not produced facts that show a genuine issue regarding whether: (1) there have been public disclosures; (2) relator's allegations are based upon public disclosures; and (3) relator is an original source of the public disclosures. Defendants argue that relator cannot rest on his pleadings, but must affirmatively produce evidence to create a genuine issue of material fact. Defendants ignore the first step in a motion for summary judgment, however: the movant must persuade the court that there is no genuine issue of material fact. Celotex, 477 U.S. at 322, 325 (following Adickes v. Kress, 398 U.S. 144, 157 (1970)). Defendants fail to carry that burden of persuasion.

## A. PUBLIC DISCLOSURES

The question is whether relator bases his action "upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media." §3730(e)(4)(A). The question is best broken into subquestions: (1) Does relator's case involve public disclosures? (2) If yes, do those public disclosures disclose the allegations or transactions of the instant case? (3) If yes, does relator base his cause of action on those public disclosures?[9]

---

[9]The court need not reach the "based upon" question because it decides this motion on the "public disclosure" and "allegations or transactions" issues.

## 1. The Greek Proceedings

Defendants argue that the Greek Proceedings were "public disclosures" of the "allegations or transactions" in the instant case. Relator disagrees, arguing that: (1) foreign proceedings, especially those conducted under seal, cannot be public disclosures; and (2) the allegations or transactions in the instant case were not actually publicly disclosed by the Greek Proceedings.

The court agrees that the Greek Proceedings are not public disclosures. Although no court has yet decided whether foreign proceedings can be public disclosures, § 3730(e)(4)(A) does not include such proceedings within the statutory list. The statute refers to various actions that can result in public disclosure, but the list, other than news media, "refers exclusively to federal sources of information." United States ex rel. Garibaldi v. Orleans Parish School Board, 21 F.Supp.2d 607, 615 (E.D.La. 1998); United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 744 (3rd Cir. 1997). Even assuming that a "proceeding" is within the FCA as a "hearing" or "investigation," foreign proceedings are excluded from the statutory definition's exclusive list. To interpret the statute to cover foreign proceedings (and by extension any foreign "report, hearing, audit, or investigation") would create too large a shield for multinational corporations accused of defrauding the U.S. Government. Such an accused corporation could avoid FCA prosecution, even in the absence of any disclosure to the U.S. government, by arguing that a foreign government investigated the matter. Foreign governments, whose interests may be adverse to the United States, cannot be allowed so to affect our rule of law.

Language barriers are another obvious reason that foreign proceedings cannot reasonably be a public disclosure of information. The FCA is concerned with disclosure to the American

13

public. United States ex rel. Lamers v. City of Green Bay, 998 F. Supp. 971, 978 (E.D. Wis. 1998). Few Americans speak, read or write Greek. Consequently, any information divulged in the Greek Proceedings was not realistically disclosed publicly for purposes of §3730(e)(4)(A), which can reasonably refer only to the American public. The American public, confronted with the text of the Greek Proceedings, would finally get the rare chance to aptly and appropriately exclaim, "It's Greek to me." Thus, information disclosed in a foreign language cannot be considered a public disclosure to the American public[10] because such information is incomprehensible to English-speaking Americans, does not prompt American public inquiry, and does not remotely ensure U.S. Government inquiry. Further, the Greek Proceedings were conducted under seal, thus rendering any information divulged therein publicly unavailable, even to the Greek-speaking American public.

Defendants also argue that the allegations or transactions in the Greek Proceedings and the instant case both involve the F-16G contract and the alleged bait and switch fraud scheme. The allegations or transactions of the instant case, however, involve defendants overbilling the U.S. government through false claims subsequent to the initial contract. Those subsequent overbilling allegations and transactions did not exist at the time of, and thus were not discussed or resolved in, the Greek Proceedings. Even if the Greek Proceedings had been public disclosures, for the allegations or transactions of the instant case to be disclosed, all of the critical

---

[10]If the U.S. Government was aware of the foreign proceedings and conducted its own investigation and translation, thereby discovering fraud against the U.S. government, then the U.S. Government's own investigation might have become a public disclosure of the information within the meaning of the FCA. The U.S. Government, however, did not conduct an investigation of the Greek Proceedings that publicly disclosed the information or any fraud against the U.S.

and essential elements that compose that fraud must appear in the disclosure. Feingold, 324 F.3d at 496. Defendants admit that relator names the U.S. Government as a new victim in the instant suit, while only the Greek government was an alleged victim in the Greek Proceedings. Because defendants do not contest that, even if the Greek Proceedings constituted a public disclosure (which it was not) an issue of fact would exist whether the Greek Proceedings were public disclosures of the allegations or transactions in the instant case.

### 2. News Articles

Defendants argue that various news articles, both Greek and American, that reported on the Greek Proceedings and underlying F-16 contract constitute public disclosures of the "allegations or transactions" in the instant case. Relator disagrees, arguing that: (1) foreign news articles are not public disclosures under §3730(e)(4)(A); and (2) neither the Greek nor American news articles disclosed the overbilling allegations or transactions in the instant case.

Most of the news articles involved are Greek language reports, although defendants provide two American newspaper articles that briefly mention the Greek Proceedings and F-16 fraud allegedly perpetrated against the Greek government, but those articles do not mention specific information regarding the instant "allegations or transactions." No court has decided whether foreign news articles are included within §3740(e)(4)(A)'s definition of "news media"; however, because the FCA excludes foreign proceedings from its definition, the same exclusion should apply to foreign news media, at the very least foreign-language news media. There is no public disclosure to the American public when information is divulged in a foreign publication, especially if published in a foreign language. In this case, publication in Greek-language news media did not publicly disclose information to the American public.

Moreover, even if the Greek articles had been public disclosures, neither the Greek nor American articles disclose the "allegations or transactions" in the instant case. The newspaper articles are not public disclosures of the instant U.S.-focused overbilling "allegations or transactions" because the "allegations or transactions" reported by those articles pertained to the alleged bait and switch fraud scheme and the Greek government. Additionally, because relator states, without contradiction, that he never saw the articles prior to commencing this action, he could not have based the instant suit on those reports. Consequently, defendants have failed to establish that the news reports contained the "allegations or transactions" underlying the instant case.

### 3. FOIA Requests

Defendants argue that information relator obtained about the Greek Proceedings pursuant to FOIA requests during Yannacopolous I constitutes public disclosure of the "allegations or transactions" in the instant case. Relator disagrees, although in somewhat roundabout fashion, arguing that: (1) the FOIA requests are not "public disclosures" because they were obtained in discovery during Yannacopolous I and not filed with that court; and (2) the FOIA requests do not disclose the "allegations or transactions" of the instant case.

The majority of circuit courts confronted with this issue have held that information divulged in a FOIA request becomes a public disclosure upon receipt of that information by the requesting party. United States ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1519-20 (9th Cir. 1995) vac'd on other grounds 520 U.S. 939 (1997). United States ex rel. Mistick PBT v. Hous. Auth. of the City of Pittsburgh, 186 F.3d 376, 383-84 (3rd Cir. 1999); United States v. A.D. Roe Co., 186 F.3d 717, 723-24 (6th Cir. 1999). To fit under §3730(e)(4)(A)'s list, the

16

FOIA information is considered an "administrative report." Mistick, 186 F.3d at 383-84. A minority view holds that FOIA information is not a "public disclosure" because it is excluded from §3730(e)(4)(A)'s list. This court regards this view as consistent with the legislative intent in enacting the 1986 amendments to the FCA. 145 Cong. Rec. E1546-01 (1999)(statement of Rep. Howard Berman and Sen. Charles Grassley, the principal House and Senate sponsors of the 1986 Amendments, that they do not view FOIA requests as public disclosures).[11]

In an unpublished opinion, citation to which is disfavored, the Fourth Circuit held that FOIA information does not amount to a "public disclosure" because it is not expressed in §3730(e)(4)(A). The Fourth Circuit's 2001 opinion is the most recent circuit court opinion on the matter. U.S. ex rel. Bondy v. Consumer Health Found., 2001 U.S. App. LEXIS 24238 (4th Cir. 2001). The Seventh Circuit has not directly decided the issue of whether information produced pursuant to FOIA requests are "public disclosures," although it did affirm a district court that held that FOIA requests are "public disclosures." Lamers, 998 F.Supp. at 979, aff'd on other grounds 168 F.3d 1013 (7th Cir. 1999). In affirming Lamers, however, the Seventh Circuit never mentioned the FOIA, stating, "In the case before us, all the facts on which Mr. Lamers based his fraud claim were publicly disclosed when the media covered the FTA's 1995 administrative decision." Id. at 1017. The Seventh Circuit affirmed Lamers because of "news

---

[11]In objecting to an increasingly inclusive view of § 3730(e)(4)(A), Rep. Berman also stated, "[W]e want forcefully to disagree with cases holding that qui tam suits are barred if the relator obtains some, or even all, of the information necessary to prove fraud from publicly available documents, such as those obtained through a Freedom of Information Act (FOIA) request . . .. We believe that a relator who uses their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a qui tam action . . .. This is especially true where a relator must piece together facts exposing a fraud from separate documents."

media" public disclosures, not on FOIA grounds. Id. Consequently, the issue has yet to be decided in the Seventh Circuit.

The FOIA issue falls between competing policy tensions in the FCA. On one hand, the FCA encourages "whistle blowing," whether by an insider or outsider. Mistick PBT, 186 F.3d at 400 (3rd Cir. 1999)(Becker, C.J. dissenting)(citing S. Rep. No. 99-345, at 1-8, 23-24 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5266-73, 5288-89). Since it is difficult for the government to investigate completely all potentially fraudulent claims, allowing an individual to investigate such claims promotes recovery of government funds. Id. On the other hand, the FCA is concerned with strike suits, especially those where an individual rehashes existing claims or investigations already in possession of the government. Id. Congress enacted the 1986 amendments to better balance the two tensions in light of a Seventh Circuit opinion that barred Wisconsin from acting as a qui tam plaintiff in a Medicare fraud case because Wisconsin previously disclosed the information to the U.S. Government as required under the pre-1986 FCA. United States ex rel. Wisconsin v. Dean, 729 F.2d 1100, 1103-04, 1106-07 (7th Cir. 1984). After the U.S. Government declined to intervene, the public disclosure bar prevented Wisconsin from litigating the case merely because the information was in federal possession, despite the fact that the federal government possessed the information only because Wisconsin supplied it. Id.

The 1986 amendments responded to Dean by amending the public disclosure bar to apply not to material in possession of the government, but to material actually disclosed to the public by the government. The overall purpose of the 1986 Amendments was to focus the public disclosure bar towards information that the public knew, not towards information that the

18

government knew. Lamers, 998 F. Supp. at 978. The glaring flaw in the dominant view (FOIA material is publicly disclosed as soon as the requesting party receives it) is that the public is not informed of the contents of the FOIA material by transmission to a private party. Only the requesting party knows about it. By deeming the material a "public disclosure" upon receipt by the requesting party, the incentive for a person to investigate fraud against the government would be destroyed, because any FOIA request would inevitably become a public disclosure under the FCA. Practically, this approach is no different from the pre-1986 approach (all information in possession of the government is a "public disclosure") because members of the public still cannot actually use that FOIA information in an FCA claim. Receipt would bar use of the information, thus destroying the incentive to investigate. Thus, if receipt of FOIA material would bar a relator's claim, then every corporation would be well-advised to request as much FOIA material as possible. If the corporation was later named a defendant in a FCA action, then anything in the FOIA request would be a public disclosure merely because the defendant asked for it in a FOIA request. Certainly, the FCA was not intended to insulate corporations in this manner.

In light of the purpose of the 1986 Amendments that public investigation and public knowledge are integral to the FCA, this court holds that an FCA action based on FOIA material is not barred unless the material has actually been disclosed to the public. Mere disclosure to the requesting party is not disclosure to the public.

Moreover, because the 1986 Amendments to §3730(e)(4)(A) did not textually include FOIA information among the list of disclosures considered public, FOIA information is not encompassed by the public disclosure bar. For information to be a "public disclosure" it must be enumerated in §3730(e)(4). Dunleavy, 123 F.3d at 744; United States ex rel. Williams v. NEC

Corp., 931 F.2d 1493, 1499-1500 (11th Cir. 1991); Garibaldi, 21 F.Supp.2d at 614. Consequently, for this additional reason, relator's FOIA material is not barred by the "public disclosure" exclusion of §3730(e)(4)(A).

Even if relator's FOIA material had been a "public disclosure," moreover, defendants fail to persuade the court that those documents reveal the essential elements of relator's current fraud allegations. GD argues in its reply that "the State Department was well aware of the allegations of fraud in connection with the Greek Government's purchase of the F-16." As support, GD attaches State Department documents requested and received by relator under FOIA. The State Department documents, however, do not disclose the essential elements of the instant overbilling allegations, but reference only the bait and switch allegations of the Greek Proceedings. Even if the State Department was aware of those bait and switch allegations, there is nothing in the FOIA documents that discloses the instant overbilling allegations, nor, for that matter, the false claim transactions. The contract referred to in the State Department documents may disclose the initial terms but, without relator's allegations of subsequent fraud, one cannot reasonably infer subsequent overbilling to the U.S. Government's detriment, nor can one infer subsequent overbilling from the Greek allegations discussed and refuted in the FOIA State Department documents.

### 4. Yannacopolous I

Defendants also argue the prior proceedings in Yannacopolous I, which involved a claim for commissions and three RICO counts, publicly disclosed the "allegations or transactions" of the instant case. Defendants argue that the core operative facts surrounding the F-16G bait and switch were disclosed in the prior "civil hearing," and that those facts make up the "allegations or

transactions" in the instant case. Relator argues that: (1) any information obtained via discovery, yet not filed with the court, is not a "public disclosure"; and (2) the information in Yannacopolous I, even if a "public disclosure," did not disclose the "allegations or transactions" of the instant action.

It is indisputable that Yannacopolous I is a "civil hearing" within the meaning of §3730(e)(4)(A), but not so clear that the allegations or transactions in the instant case were disclosed in that suit. Documents produced during discovery, but not filed with the court, are not available to the public and are thus not "public disclosures" under §3730(e)(4)(A). United States ex rel. Mathews v. Bank of Farmington, 166 F.3d 853, 860 (7th Cir. 1999). Conversely, documents filed with the court are "public disclosures" in a "civil hearing," thus prompting the initial question whether relator filed any discovery documents in Yannacopolous I that disclosed the "allegations or transactions" of the instant case.

Defendants argue that the essential elements of relator's second amended complaint were publicly disclosed in Yannacopolous I. For example, defendants point out that GD filed a motion in Yannacopolous I to exclude evidence related to the Greek Proceedings, including background to the Greek Proceedings. Defendant argues that any allegations related to the Greek Proceedings involve the same core of operative facts as the instant case, and thus any "public disclosures" referencing the Greek Proceedings constitutes a "public disclosure" of those facts. Defendants state that both cases involve the "same core of operative facts (sale of the F-16 to Greece) and the same fraud (overcharging and cheating on offsets)," and argue that the only new allegation is fraud against the U.S. Government. The court disagrees.

21

Although anything filed in <u>Yannacopolous I</u> constitutes a "public disclosure," <u>Mathews,</u>
166 F.3d at 860, nothing defendant references publicly disclosed the instant "allegations or
transactions." The instant suit alleges overbilling that occurred after the fraud alleged in the
Greek Proceedings. Thus, the allegations of the instant complaint reference an entirely different
time period and different fraudulent activity. The instant allegations also allege an entirely new
victim, the U.S. Government.

Defendants argue that the U.S. Government had notice of the instant allegations because
of the publicly disclosed documents that pertain to the Greek Proceedings filed in <u>Yannacopolous</u>
<u>I</u>. Those documents merely show that the U.S. Government had notice that the Greek
Proceedings determined that GD committed no bait and switch fraud in relation to the initial
contract. Those documents do not show that the U.S. Government, or, more importantly, the
American public, had notice that defendants allegedly committed fraud subsequent to those
Proceedings, nor do those documents show that the U.S. was a victim of any fraud. If anything,
those documents show that there was no victim in an initial bait and switch because those
allegations were dismissed. What occurred after the refuted bait and switch fraud allegations is
the subject of the instant case. Defendants fail to persuade the court that the instant "allegations
or transactions" were disclosed in <u>Yannacopolous I</u>.

For the reasons stated above, neither the Greek Proceedings, news media, FOIA
materials, nor <u>Yannacopolous I</u> publicly disclosed the instant "allegations or transactions."

**B. ORIGINAL SOURCE**

Moreover, even if relator based his action on "public disclosures," the court concludes
that there are contested issues of fact whether relator is an original source of "the information on

which the allegations are based," and whether relator had "direct and independent knowledge" of the allegations in the instant case, and consequently whether relator is excepted from § 3730(e)(4)(A).

Defendants argue that relator bases his entire suit upon public disclosures and lacks any direct and independent knowledge of the allegations contained in his complaint. Defendants argue that relator's relationship with GD ended in 1983, and that relator subsequently obtained his information through various public disclosures. Despite defendants' contention, an independent investigation can form the basis of "direct and independent" knowledge within the statutory definition. See United States ex rel. Barajas v. Northrop Corp., 5 F.3d 407, 410 (9th Cir. 1993)(citing 132 Cong. Rec. 20536 (Aug. 11 1986)(demonstrating legislative intent to allow a relator to base allegations on public information assembled by him).

Defendants rely on Feingold, 324 F.3d at 497, to disparage the independent investigation argument, but Feingold does not foreclose the possibility of a future relator successfully developing "direct and independent knowledge" through such an investigation. The Feingold court cited Mathews, 166 F.3d at 865, for its holding regarding an "original source," but offered little elaboration on "original source" determinations. Feingold, 324 F.3d at 497. A full reading of Mathews shows a Seventh Circuit view that "in an exceptionally or unusually complicated allegation of fraud each piece of the information may be publicly disclosed, yet the fraud itself may remain hidden until some perspicacious plaintiff puts it in perspective. We acknowledge that in such a case, a plaintiff might be an original source even though her knowledge of every isolated element of the fraud is based upon public disclosures." Mathews, 166 F.3d at 864. See also Kennard v. Comstock Resources, Inc., 2004 WL 723249 (10th Cir. 2004)(independent probe

of public documents qualifies qui tam relator as original source). In both Feingold and Mathews the alleged fraud was "a simple affair," thus precluding those plaintiffs from invoking their independent investigations as the basis for their "direct and independent knowledge." Id. Here, the fraud alleged is quite complex, involving various schemes acted on an international stage over portions of four decades.

Relator argues that, but for his independent investigation, the U.S.-focused information on which the instant allegations are based would never have been disclosed. Relator thus claims to be an "original source." Essentially, relator argues that the allegations regarding fraud against the U.S. government would not have been possible without his investigation. Defendants doubt that relator conducted any independent investigation, assuming that the allegations of fraud were based entirely on public disclosures.

Relator's argument that fraud against the United States would not have been alleged without his investigation is, however, more than a "conclusory assertion." Feingold, 324 F.3d at 497. The supposed public disclosures show an absence of facts regarding fraud perpetrated against the U.S.[12] Even if relator based the second amended complaint on publicly disclosed material, the trier of fact could reasonably decide that he was an "original source" because he discovered and synthesized that information during an independent investigation.

---

[12]Nearly every "public disclosure" alleged by the defendants fails to mention any possible implication of the GD F-16 program on the United States.

24

## CONCLUSION

For the reasons stated herein, defendants' motions to dismiss and motion for summary judgment are denied. This matter is set for a report on status on May 13, 2004, at 9:00 a.m.

**ENTER:**      **April 27, 2004**

**Robert W. Gettleman**
**United States District Judge**