IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ) <br> DIMITRI YANNACOPOULOS, ) <br> ) <br> Relator-Plaintiff, ) <br> ) <br> ) <br> ) <br> GENERAL DYNAMICS and LOCKHEED ) <br> MARTIN CORPORATION, ) <br> ) <br> Defendants. ) | No. 03 C 3012 <br><br> Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Relator Dimitri Yannacopoulos has brought a seven count second amended qui tam complaint against defendants General Dynamics and Lockheed Martin Corporation alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., in connection with defendants' sale of F-16 aircraft to the government of Greece. Defendants have moved for partial summary judgment on certain claims raised in relator's complaint but not set out as separate counts. Specifically, defendants seek summary judgment on, (1) all claims attempting to hold them liable for violations of the FCA based on the theory that defendants' impliedly certified compliance with certain Defense Security Assistance Agency (the "DSAA") guidelines not specifically referenced in the actual contract or invoices ("the implied certification claim"), and (2) plaintiff's claim that defendants eliminated an Economic Price Adjustment Clause ("EP Clause") from the final contract without informing DSAA in violation of defendants' express certification that it would inform DSAA of any contract changes "upon effect" (the "express certification claim"). For the reasons set forth below, defendants' motion for partial summary judgment is granted.

# **BACKGROUND**[1]

This case involves a contract executed in January 1987 between Greece and General Dynamics for the sale of 40 F-16 aircraft ("Contract 5/86").[2] Defendant Lockheed Martin acquired General Dynamics' Fort Worth division and assumed all of General Dynamics' rights and obligations under Contract 5/86 in March 1993. Contract 5/86 was a direct commercial contract, meaning that Greece contracted directly with General Dynamics, and the United States was not a party. Greece, however, used foreign military financing ("FMF") loans provided by the United States government, to finance its purchase, which required DSAA to review the contract and approve the use of FMF funds.

In March 1985, General Dynamics and Greece executed a letter of intent ("LOI") setting forth the basic terms of their agreement as of that date. The effective date of that LOI was October, 1985. Attached to the LOI was a "draft contract" reflecting the status of the negotiations on various contract articles and annexes.

DSAA required General Dynamics to submit a "Contractor Certification and Agreement with the Defense Security Assistance Agency" ("Certification") which set forth General Dynamics' agreement with DSAA as to conditions of payment. General Dynamics submitted its first such Certification in February 1986 when General Dynamics and Greece sent DSAA the LOI that ultimately resulted in Contract 5/86. A largely identical Certification was submitted by

---

[1]A more complete description of the underlying facts can be found in the court's opinion denying defendants' motion to dismiss. U.S. ex rel Yannacopoulos v. General Dynamics, 315 F. Supp. 2d 939 (N.D. Ill. 2004).

[2]This action was originally filed under seal in the Southern District of Ohio in April 1996 pursuant to 31 U.S.C. § 3730(b)(2). The case was transferred to this court and unsealed in June 2003.

2

General Dynamics in February 1987 when Contract 5/86 was finalized and signed. Each Certification was drafted by DSAA and contained thirteen enumerated paragraphs setting forth the terms of the agreement with DSAA. Paragraph 10 of the Certification provided that General Dynamics:

> Certifies that the entire agreement which effects the contractual relationship between the contractor and the purchasing government relating to this Purchase Agreement consists of: Letter of Intent, dated 6 March 1985, including Annexes and documents listed therein and that there are no other amendments, modifications, side letters, or supplementary agreements relating to this Purchase Agreement. Agrees that any future changes with the terms of the Purchase Agreement will be reported to the DSAA upon effect.

Under the initial contract documents Greece agreed to make a $24 million down payment followed by quarterly milestone payments pursuant to a fixed schedule set forth in Annex A6 to Contract 5/86. The quarterly payments were due on the scheduled date provided defendants had completed the prescribed milestone events associated with each such payment. Defendants' right to receive the milestone payments was not limited by their actual cost of performance, nor were defendants required to substantiate their incurred costs, or provide any cost information at all. Rather, they submitted a "Certificate of Work-In-Progress" representing that had completed the necessary milestone events.

Defendants submitted each invoice or payment to the government of Greece. On each invoice defendants represented that the invoice was in accordance with Contract 5/86 (or the LOI) and defendants' Certification with DSAA. The invoices did not incorporate or adopt any DSAA guidelines either expressly or by reference. Greek authorities reviewed each invoice to confirm that payment was proper. Greek representatives approved the invoices for payment, signed the Certificate of Work-in-Progress and sent the invoices on to the U.S. government with

3

requests that they be paid. It is undisputed that defendants completed each of the requisite milestone events associated with each quarterly payment at issue, and that the Greek government approved each invoice submitted by defendants.

The parties performed under the LOI and draft contract while they negotiated the terms of the final contract. Because General Dynamics was receiving milestone payments that were not based on or limited by its costs incurred, the draft contract contained a clause that would require that the final contract price would be reduced by the value of the imputed interest General Dynamics obtained by receiving so much of the price up front before incurring costs equal to the payments received. That clause was contained in Article 11 of the draft contract and was titled "Economic Price Adjustment for Advanced Payment" (the "EPA Clause"). Negotiation of the final terms of the contract continued for 22 months. Among many provisions continually discussed were the delivery dates and the EPA Clause. In particular, General Dynamics wanted elimination of the EPA Clause as a quid pro quo for an accelerated delivery schedule requested by Greece.

The parties executed the final version of Contract 5/86 on January 12, 1987. The contract was submitted to DSAA (by Greece) in February 1987 along with General Dynamics' Certification. The final version of Contract 5/86 did not contain the EPA Clause, but did include the accelerated delivery schedule. The instant motion for partial summary judgment on the express certification claim requires the court to decide, (a) when the parties actually reached an agreement as to the elimination of the EPA Clause, and (b), if or when DSAA was notified of that modification of the contract. It is undisputed, however, that DSAA received and reviewed

4

the final version of Contract 5/86 prior to approving Greece's request to use FMF funds to finance the entire purchase price.

## DISCUSSION

<u>Implied Certification with DSSA Guidelines</u>

Although not entirely clear from his complaint or brief, relator appears to be alleging that defendants violated the FCA by falsely certifying with each invoice and request for payment that they were in compliance with all DSAA guidelines. In particular, relator alleges that defendants failed to comply with paragraphs 4 and 18 of the October 1985 version of the DSAA guidelines. Because neither the invoices nor the Certification contains any reference to those particular guidelines, relator argues that with the submission of each invoice defendants impliedly certified compliance with all DSAA guidelines.

To succeed under this theory, plaintiff must show that compliance with the relevant statutes and regulations was a condition of receiving payment. <u>U.S. ex rel. King v. Moran, Inc.</u>, 2002 WL 2003219 at *11 (N.D. Ill. 2002) (citing <u>U.S. ex rel. Hopper v. Anton</u>, 91 F.3d 1261, 1266-68 (9th Cir. 1996). Opinion letters or other such agency pronouncements that have not been established after formal adjudication or notice-and-comment rulemaking, lack the force of the law. <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000). Thus, internal agency guidelines that are not subject to the rigors of the Administrative Procedure Act, including public notice and comment, are not entitled to full deference under <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984). Therefore, evidence of a failure to comply with an administrative guideline does not, on its own, "establish that a defendant presented legally false

claims – claims in violation of a statute or regulation to the United States." U.S. ex rel. Walker v. R&F Properties, 433 F.3d 1349, 1357 (11th Cir. 2005).

It is undisputed that the DSAA guidelines were not promulgated pursuant to any rulemaking power of the agency. They were not subject to notice-and-comment rulemaking or the rigors of the Administrative Procedure Act. Indeed, the undisputed evidence demonstrates that DSAA modified, amended, and/or waived the guidelines whenever it saw fit. They do not have the force of law, and therefore evidence that General Dynamics may have failed to technically comply with a particular guideline not referenced in its Certification does not establish an FCA violation.

Relator argues that the issue is not whether the guidelines have the force of law, but whether they are governing rules, compliance with which is a precondition to payment. Because the guidelines to not have the force of law on their own, relator must point to some authority to demonstrate that compliance with each guideline is a precondition to payment. There is no such evidence. In fact, the evidence demonstrates just the opposite. Compliance with all the guidelines was never contemplated, at least with respect to Contract 5/86.

Relator's predominate claim in this regard is that with each invoice defendants impliedly certified compliance with guideline paragraph 18. That guideline provision provides in relevant part:

> Follow-on payments will be based upon the accomplishment of specific
> milestones detailed in the contract based on deliveries or contractor costs incurred
> . . .. Payments including the down payment will not be greater that contractor's
> costs incurred as of the date of the invoice plus costs to be incurred (which
> include termination liability less profit) through the next 90 days.

Any argument that defendants were required to certify that the instant contract complies with paragraph 18 is doomed from inception. The original draft agreement, which was approved

6

by DSAA, clearly called for quarterly milestone payments to General Dynamics well in excess of General Dynamics' costs. Indeed, the draft contract was so front-loaded that the parties included the EPA Clause to account for the imputed interest. The entire payment structure of Contract 5/86, from its inception to its conclusion, was beyond the bounds of paragraph 18. Compliance with paragraph 18 was never contemplated and certification of compliance with paragraph 18 was not and could not have been a condition for payment.

Accordingly, the court concludes that there is no evidence to support a theory that defendants impliedly certified compliance with all DSAA guidelines. They expressly certified compliance with those guidelines specifically referenced in the Certification and no more. Defendants' motion for summary judgment on the implied certification claim is granted.[3]

Express Certification Claim

Relator's express certification claim centers around the elimination of the EPA Clause from the final version of contract 5/86 which the parties signed on January 12, 1987, and was sent to DSAA by Greece on February 3, 1987. The Certification contained a provision that required General Dynamics to report any changes to the draft contract "upon effect."

Relator claims that by mid-June 1986 General Dynamics and Greece had agreed to remove the EPA Clause from the draft contract but did not report that agreement to DSAA until Greece submitted the final contract in February 1987. General Dynamics had submitted three invoices totalling $70 million in late June, September and December, 1986, each time certifying

---

[3]The court's holding applies equally to relator's implied certification claim relating to General Dynamics' alleged use of FMF funds to capitalize the Greek chartered company known as HBDIC. The ruling has no effect on relator's express certification claims as to the capitalization of HBDIC.

7

that it was in compliance with the Certification when, according to relator, it had not yet told DSAA that the EPA Clause had been eliminated.

This claim is belied by the undisputed documentary evidence contained in the record. On May 9, 1986, D. Lane Everett, Manager of Contracts for General Dynamics' Fort Worth Division, sent a letter to John DeSoto, Chief of Commercial Services and Internal Control at DSAA informing DSAA of certain changes to the draft contract. Attached to that letter was an April 8, 1986, letter sent from Everett to Lt. General John Marinakis of Greece, outlining the changes to the contract. Paragraph 4 of that letter specifically indicates that "part of the quid pro quo for the accelerated delivery schedule is the agreement that the provision for the imputed interest [EPA Clause] in Article 11 of the draft contract is no longer applicable." A copy of Addendum 1 with the changes to the contract, was attached to the May 9, 1986 letter to DeSoto of the DSAA.

Despite this documentary evidence relator argues that at the time of the May 9, 1986, letter, Greece had not yet agreed to the elimination of the EPA Clause. Final agreement, according to relator, did not happen until mid June 1986, rendering the May 9, 1986, letter ineffective notice.

Even if relator is correct, however, and there is little to support this contention, General Dynamics re-sent the very same documents by facsimile on July 15, 1986, to Major Kerrins of DSAA. The copy of Addendum 1 faxed to Kerrins was initialed by both parties, indicating agreement with the elimination of the EPA Clause. Therefore, the evidence very clearly demonstrates that General Dynamics put DSAA on notice of the elimination of the EPA Clause at the time it was negotiated and certainly well before DSAA approved the final version of

Contract 5/86. If Robert Wise and Diehl McKalid of DSAA were unaware that the EPA Clause had been removed from the contract when they signed off on the final version, it was not because of a lack of notice from General Dynamics.

In short, the undisputed evidence demonstrates that DSAA was informed timely of the removal of the EPA Clause from Contract 5/86. Accordingly, defendant's motion for summary judgment on relator's express certification claim is granted.

## **CONCLUSION**

For the reasons set forth above, defendants' motion for partial summary judgment is granted.

**ENTER: FEBRUARY 13, 2007**

_____
**Robert W. Gettleman
United States District Judge**