IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | ) | |
| DIMITRI YANNACOPOULOS, | ) | |
| | ) | |
| Relator, | ) | |
| | ) | No.  03 C 3012 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| GENERAL DYNAMICS and LOCKHEED | ) | |
| MARTIN CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In a seven count second amended qui tam complaint,[1] Relator Dimitri Yannacopoulos

alleges that defendants General Dynamics and Lockheed Martin violated the False Claims Act,

31 U.S.C. § 3729 ("FCA"), by submitting false claims in connection with the sale of F-16 fighter

aircraft to Greece.  Count I alleges that General Dynamics knowingly submitted false records,

statements, and claims to the Defense Security Assistance Agency ("DSAA"), collecting at least

$24 million in excess funds in connection with the F-16 airframe.  Count II alleges that General

Dynamics collected over $52 million of fraudulently obtained funds in connection with

debt-level maintenance.  Count III alleges that General Dynamics submitted false claims in the

excess of $47 million in connection with co-production (the "HDDIC claim").  Count IV and V

are brought against both General Dynamics and Lockheed Martin, who purchased General

Dynamic's Fort Worth division at the end of February 1993 and assumed the Greek contract.

---

[1]This action was first filed in the United States District Court of Ohio, Western Division
under seal in 1996, pursuant to 31 U.S.C. § 3730(b)(2), and unsealed on June 3, 2003, after the
government declined to pursue the case.  This case was reassigned to this court on September
2003.

Count IV alleges that defendants submitted $54 million in false claims for integrated electronic measures counter work, and Count V alleges false statements and claims in excess of $45 million and $6 million in connection with the sale of spare parts (the "Spares Claim"). Count VI alleges that General Dynamics failed to disclose to the United States government that it had deleted a price adjustment schedule between the date of the letter of intent and the final contract. Finally, Count VII alleges that Lockheed Martin modified the contract to avoid paying a refund it owed to the government.

The court has already denied a motion to dismiss, United States ex rel. Dimitri Yannacopoulos v. General Dynamics, 315 F. Supp.2d 939 (N.D. Ill. 2004), and later granted General Dynamics' motion for summary judgment on certain claims raised in the complaint but not set out as separate counts. Specifically, the court granted summary judgment on: (1) all claims attempting to hold defendants liable based on the theory that defendants impliedly certified compliance with all DSAA guidelines not specifically referenced in the actual contract or invoices (the "Implied Certification Claims"); and (2) plaintiff's claim that defendants eliminated an Economic Price Adjustment Clause (the "EPA Clause") from the final contract without informing DSAA, in violation of defendants' express certification that it would inform DSAA of any contract changes "upon effect" (the "Express Certification Claim"). Relator moved to reconsider, which the court granted as to the Express Certification Claim only.

General Dynamics has now renewed its motion for summary judgment on the Express Certification Claim, which the court has treated as a motion to reconsider, and both defendants have filed separate motions for summary judgment on all remaining claims brought against them.

For the reasons set forth below, the motions for summary judgment are granted. The motion to reconsider is granted.

**BACKGROUND**

This case involves a contract executed in January 1987 between Greece and General Dynamics for the sale of 40 F-16 aircraft ("Contract 5/86"). Defendant Lockheed Martin acquired General Dynamics' Fort Worth division and assumed all of General Dynamics' rights and obligations under Contract 5/86 in March 1993. Contract 5/86 was a direct commercial contract, meaning that Greece contracted directly with General Dynamics, and the United States was not a party. Greece did, however, use foreign military financing ("FMF") loans provided by the United States' government to finance the purchase, which required DSAA to review the contract and approve the use of FMF funds.

In March 1985 General Dynamics and Greece executed a letter of intent ("LOI") setting forth the basic terms of their agreement as of that date. The LOI was effective as of October 1985 and attached to it was a "draft contract" reflecting the status of the negotiations on various contract terms, articles and annexes.

DSAA required General Dynamics to submit a "Contractor Certification and Agreement with the Defense Security Assistance Agent" ("Certification") which set forth General Dynamics' agreement with DSAA as to conditions of payment. General Dynamics submitted its first Certification in February 1986 when it and Greece sent DSAA the LOI that ultimately resulted in Contract 5/86. General Dynamics sent a largely identical Certification in February 1987 when Contract 5/86 was finalized and signed. DSAA drafted the Certifications, each

containing thirteen enumerated paragraphs setting forth the terms of the agreement with DSAA.

Paragraph ten of the Certification provided that General Dynamics:

> Certifies that the entire agreement which effects the contractual relationship between the contractor and the purchasing government relating to this Purchase Agreement consists of: Letter of Intent, dated 6 March 1985, including Annexes and documents listed therein and that there are no other amendments, modifications, side letters, or supplementary agreements relating to this Purchase Agreement. Agrees that any future changes with the terms of the Purchase Agreement will be reported to the DSAA upon effect.

Under the initial contract documents Greece agreed to make a $24 million down payment followed by quarterly milestone payments pursuant to a fixed schedule set forth in Annex A6 to Contract 5/86. The quarterly payments were due on the scheduled date provided defendants had completed the prescribed milestone events associated with each payment. Defendants' right to receive the milestone payments was not limited by their actual cost of performance, nor were defendants required to substantiate their incurred costs, or provide any cost information at all. Instead, they submitted a "Certification of Work-In-Progress" representing that they had completed the necessary milestone events.

Defendants submitted each invoice for payment to the Greek government. On each invoice defendants represented that the invoice was in accordance with Contract 5/86 (or the LOI) and defendants' certification with DSAA. Greek authorities reviewed each invoice to confirm that payment was proper. Greek representatives approved the invoices for payment, signed the Certification of Work-In-Progress and sent the invoices to the U.S. government with requests that they be paid.

The parties performed under the LOI and draft contract while they negotiated the terms of the final contract. The draft contract contained a clause that would require that the final

4

contract price be reduced by the value of the imputed interest General Dynamics obtained by receiving so much of the price up front before incurring costs equal to payments received.  That clause (the "EPA Clause") was contained in Article 11 of the draft contract.  Negotiations of the final terms of the contract continued for 22 months.  Among the many provisions continually discussed were the delivery dates and the EPA Clause.  General Dynamics wanted elimination of the EPA Clause as a quid pro quo for an accelerated delivery schedule requested by Greece.

The parties executed the final version of Contract 5/86 on January 12, 1987.  Greece submitted the contract and General Dynamics' Certification to DSAA in February 1987.  The final version did not contain the EPA Clause, but did include the accelerated delivery schedule.

## **DISCUSSION**

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990).  The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing summary judgment.  Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The non-moving party, however, "must do more than simply show that there is

some metaphysical doubt as to the material facts." <u>Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "There mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonable find for [the non-moving party]." <u>Anderson</u>, 477 U.S. at 252.

To help make this task easier, the Northern District of Illinois has adopted Local Rule ("L.R.") 56.1 which requires certain filings in support of and in opposition to motions for summary judgment. Specifically, L.R. 56.1(a)(3) requires the movant to provide a statement of material facts as to which it contends there is no genuine issue. The statement must be in a form of numbered paragraphs with specific references to the parts of the record or other supporting materials relied upon. The non-movant must reply to each paragraph, either admitting that the statement is uncontested or stating that it disagrees, specifically citing to supporting materials showing there is a genuine factual dispute. L.R. 56.1(b)(3)(A), (B). The non-movant may also supply a statement of additional facts that would defeat summary judgment, again in the form of numbered paragraphs with supporting citations. L.R. 56.1(b)(3)(C). The moving party must then reply to the statement of additional facts paragraph by paragraph, admitting the statement or contesting it, with specific citations to supporting materials.

In briefing the two summary judgment motions, the parties submitted more than 300 pages of briefs, (many of them tightly spaced with dense footnotes) and thousands of pages of exhibits to the court over a protracted period of time. The court acknowledges the complexity of this case and the voluminous materials compiled over the long history of the Greek aircraft orders. Nevertheless the court found the briefs to be repetitive and needlessly verbose, reflecting

a number of "moving targets " as the parties, especially Relator, constantly changed positions on key arguments.

To make matters worse, Relator filed two separate documents purportedly pursuant to L.R. 56.1 (b)(3)(C), each entitled "Relator's Local Rule 56.1 Statement of Additional Facts." Each such document was supported by an appendix of exhibits consisting of several binders. Neither of the statements of additional facts nor any of the numerous appendices and binders indicate to which defendant's motion they were intended to respond. The separate sets of exhibits  used the same numbering system and contained many of the same documents, meaning that many documents had two exhibit numbers.  As a result, Relator's filings have unnecessarily complicated an already complicated case.

Lockheed Martin's Motion for Summary Judgment

Relator's claims against Lockheed Martin arise out of invoices submitted for work done pursuant to two contract line items ("CLINs"); one for the Internal Electronic Countermeasures ("IECM") system (CLIN 15) and the other for the sale of spare parts (CLIN 3).

Count IV

In Count IV Relator alleges that Lockheed Martin submitted false invoices in connection with the IECM program.  In March 1993 Lockheed Martin and Greece executed Modification 5 to Contract 5/86.  Modification 5 added IECM integration to the contract and became CLIN 15. The IECM integration program was a fixed price line item, meaning that the price agreed to between Lockheed Martin and Greece was not subject to any adjustment on the basis of Lockheed Martin's costs with respect to the IECM program specifically or Contract 5/86 in general.  As with the overall contract, payments under CLIN 15 were tied to specific milestones.

The IECM integration program involved the integration of the Advanced Self Protection Integrated System ("ASPIS") electronic warfare suite into the 40 Peace Xenia I Block 30 Configuration F-16s that were the subject of Contract 5/86. Sometime in late 1992 Greece had entered into a contract with the United States government for the sale of 40 additional F-16s (the "Peace Xenia II Contract"). The PX II F-16s were Block 50 configuration, meaning that they had slightly different capabilities and functions than the F-16s sold under Contract 5/86. The ASPIS suite was being integrated into both the Block 30 and Block 50 aircraft. Because of the differences between the aircraft, the task of integrating the ASPIS suite on each required different "non-recurring" design and testing work.

Equipment installed on an aircraft is broken down into two general classes. "Group A" provisions are equipment that, on installation, stay on the aircraft (i.e. fixtures). Generally speaking this equipment is expected to last the life of the aircraft or be repairable in place. "Group B" equipment included the more expensive components that are normally removed from the aircraft when the equipment fails. Group B equipment generally consists of system boxes supplied by vendors. The ASPIS suite, manufactured by Litton, was Group B equipment. The Group A equipment, which was provided by Lockheed Martin, was the other changes to the aircraft required to install and connect the Group B (ASPIS suite) to allow it to function properly without interfering with other existing aircraft systems.

Design, testing and manufacture of Group A provisions requires both "recurring" and "non-recurring" tasks. Non-recurring tasks include the definitions of the functional interfaces, partitioning of the interfaces into physical parts, and the design and testing of the Group A provisions. Recurring tasks include manufacturing or procuring equipment and then installation

of the Group A provisions on each aircraft. In the IECM integration project (CLIN 15) the non-recurring tasks were the design and development of the ASPIS Group A provisions for the 40 Block 30 configuration aircraft. The recurring tasks consisted of procurement of materials and the manufacturing of the 40 ASPIS Group A provisions, and installation on two aircraft. Installation on the remaining 38 aircraft was done by the Hellenic Air Force after training by Lockheed Martin.

In Count IV Relator raises two theories of recovery for the alleged false claims. In the first, Relator argues that Lockheed Martin charged thousands of hours of Group A design component work to the Peace Xenia II contract instead of the fixed base cost 5/86 Contract. According to Relator, prior to the execution of Modification 5, Lockheed Martin and Greece negotiated and agreed to "ground rules" under Contract 5/86 for determining which contract would be charged for the costs of common Block 30/Block 50 work. In general, most of the common costs, except tooling, were to be charged to Contract 5/86. According to Relator's expert, over 15,000 hours of common Block 30/Block 50 IECM integration work that should have been charged to Contract 5/86 were charged to Peace Xenia II, meaning that Lockheed Martin was paid twice.

Lockheed Martin's argument with respect to this theory is twofold. First, it disagrees with Relator's description of the Peach Xenia II contract as "cost based." In reality, the Peace Xenia II contract, like Contract 5/86, is a fixed cost contract. The Peace Xenia II contract, however, is between Greece and the United States directly. Because it was an FMS (foreign military sales) contract, Lockheed Martin was entitled to progress payments based on costs incurred. Thus, Lockheed Martin's costs were not relevant to the overall cost of the IECM

program, but costs determined the timing of payments to Lockheed Martin. Therefore, even if Relator's theory is factually correct, Lockheed Martin would not have received additional funds under the Peace Xenia II contract; it would simply have received those funds earlier.

Next, as Lockheed Martin points out, there is a more basic problem with Relator's theory. It is undisputed that Contract 5/86 was a fixed price contract, and that Lockheed Martin's right to payment under the contract and the IECM integration program was not based on its costs or labor hours expended. Therefore, even if "costs" were shifted from a fixed cost contract to a cost based contract, the invoices and payments under the fixed cost contract would not be false so long as the preconditions for payment under that contract had been met. In the instant case it is undisputed that Lockheed Martin met the milestone requirements for payment under Contract 5/86. As Lockheed Martin correctly argues, it would be the invoices and requests for payments under the Peace Xenia II contract that may support a False Claim Act claim (if it were a cost based contract), but the instant complaint has no such allegation. Accordingly, Relator's claim that Lockheed Martin violated the FCA by shifting costs from Contract 5/86 to Peace Xenia II fails as a matter of law.

Relator's second theory with respect to the IECM program is that Lockheed Martin "billed" under CLIN 15 for work and equipment that had already been paid for and installed on the Block 30 aircraft under CLIN 1. Relator alleges that Lockheed Martin fraudulently provided duplicate and unnecessary Group A provisions for which it was paid twice: once under CLIN 1when the Block 30 aircraft were initially produced, and a second time when Lockheed Martin included duplicate components within its "retrofit kits" that were used under CLIN 15.

This claim relates to Group A provisions needed to install the ASPIS suite onto the Block 30 aircraft. According to Relator, the aircraft were initially produced with full Group A provisions for the initially envisioned radar warning receiver ("ALR-69") and the chaff and flare system ("ALE-40") and partial Group A provisions for the jammer ("ASPJ"). These provisions were charged, paid for and installed under CLIN 1.

When Greece decided to go with the more advanced ASPIS suite on the Block 30 aircraft, the parties executed Modification 5, and Lockheed Martin prepared retrofit kits that contained the Group A provisions to be used for the installation of the ASPIS suite. Lockheed Martin charged $280,000 for each retrofit kit and submitted a list of parts used to both Greece and the United States for approval. Relator's expert examined the parts list and determined that it contained expensive parts that had already been paid for and installed on the aircraft.

Lockheed Martin argues that the allegations amount to nothing more than a complaint that the price it charged for the retrofit kits, which was agreed to by Greece and the United States, was too high. Any such claim is doomed, according to Lockheed Martin, because of the fixed based nature of the contract. It is undisputed that the Contract 5/86 IECM integration program, and the recurring costs associated with provisions of the ASPIS Group A retrofit kit, was not priced on a component by component basis, but rather on an end product or complete kit basis. Therefore, if Lockheed Martin ended up using parts that it did not need because those parts had already been supplied under CLIN 1, Lockheed Martin, not Greece would be eating the cost of those additional parts. Lockheed Martin got the same amount whatever its cost was to produce the retrofit kit. "[T]he mere fact that an activity may be accomplished less expensively in a fixed price contract falls measurably short of fraud under the [FCA]." U.S. ex rel. Wikens v.

<u>North American Construction Corp.</u>, 173 F. Supp.2d 601, 635 (S.D. Tex. 2001). The court agrees with Lockheed Martin that Relator's claim is a veiled inflated pricing fraud -in-the- inducement allegation that essentially argues that had Lockheed Martin not included the costs of unnecessary parts in the price of the retrofit kit, the price to Greece would have been less. Of course, the price of the IECM integration program was fixed as a whole, not on a component by component basis, and Relator has not pled a fraud in the inducement theory in any event.

Moreover, the underlying facts do not support a fraud claim. Lockheed Martin had provided to Greece everything that Relator's expert Mosely had. Thus, Greece was fully informed as to what had already been installed on the Block 30 aircraft under CLIN 1, and what Lockheed Martin planned to install via retrofit under CLIN 15. Yet, Greece executed Modification 5, which added CLIN 15, with full knowledge and approved every invoice.

Accordingly, for the reasons stated above, Lockheed Martin's motion for summary judgment on Count IV is granted.

<u>Count V - Spares</u>

In Count V, Relator alleges that Lockheed Martin (as well as General Dynamics) submitted false invoices with respect to CLIN 3 under which defendants sold spare parts to Greece. CLIN 3 was one of the original ten CLINs within the "Basic Program" and was included in the contract's initial payment schedule. General Dynamics, and later Lockheed Martin, submitted invoices against the collective value of these basic programs. In his brief in opposition to Lockheed Martin's motion for summary judgment, Relator identifies sixteen invoices in which he claims that Lockheed Martin falsely certified "that no material facts have

been omitted."[2]  Because these invoices covered work performed under the entire Basic Program of the contract, none specifically referenced the spares line item (CLIN 3).  It is undisputed that although Lockheed Martin had completed the required milestone event for each payment, submission of the invoices (and thus the payment) were withheld at the time of scheduled payment until such time as Lockheed Martin and Greece had resolved differences as to parts/components that deviated from the approved F-16 configuration baseline by agreeing that Lockheed Martin could invoice for withheld funds pertaining to those parts.  That agreement was properly documented pursuant to certain deviation/labor provisions in Annex N (¶ 5.6) of Contract 5/86.

Despite Lockheed Martin and Greece's negotiated settlement of the spares issues before any request by Lockheed Martin of the scheduled milestone payments, Relator claims that the "spares invoices" were nonetheless false because they did not disclose that at the time they were submitted and paid Lockheed Martin's "liability account for Greece advanced payment" contained a "sufficient balance of unearned customer deposits to pay the invoice."

Defendants created and maintained an internal accounting designation known as the 361 Greece Advanced Payment Liability Account (the "361-01 Account").  Upon receipt of payment defendants allocated portions of those payments to incurred cost and profit as the program progressed.  According to defendant (and Relator does not dispute) the purpose of the 361-01 Account was to designate a portion of the payments received as unrecognized proceeds from a financial accounting standpoint, until such time as the true costs of the program became known

---

[2]Lockheed Martin argues that only eleven allegedly false invoices were identified in Relator's discovery responses.

and the amounts could be reallocated as either costs or profit. Because of the length (in terms of performance) of contract 5/86 and the numerous modifications of several contract line items, identification of the true costs took several years.

Relator's theory is that Lockheed Martin was required to disclose its internal accounting of the "costs" of the contract, and that failure to disclose the amounts allocated to the 361-01 Account rendered the certifications false. Relator claims that each time a "spares invoice" was submitted, Lockheed Martin should have revealed that the 361-01 Account had sufficient funds to cover the invoice.

As Lockheed Martin points out, however, Relator does not directly argue (or even allege) that Lockheed Martin was overpaid. In fact, he specifically alleges that the amounts ultimately invoiced and paid under CLIN 3 were separately negotiated under Contract 5/86's deviation/waivers provision "after [the parties] had resolved differences as to parts/components that deviated from the approved F-16 configuration baseline by agreeing that Lockheed Martin could invoice for withheld funds pertaining to those parts/components." Thus, Relator's only claim is that Lockheed Martin should have disclosed its internal accounting to DSAA. Yet, Relator fails to articulate why Lockheed Martin's internal accounting procedures were material to DSAA's decision to authorize payment for parts undisputedly delivered, particularly since all payments could have been "applied" to any of the "Basic Program" line items.

Relator also claims that the invoices were false because they did not disclose that General Dynamics had "secretly manipulated the FMS funds it collected for the spares line item in derogation of the terms of Contract 5/86 and DSAA policy to avoid a contractual obligation to refund millions of dollars collected on the spares line item. Thus, Relator's claim against

Lockheed Martin is that it did not disclose General Dynamic's fraud. Because this claim depends on whether General Dynamics committed fraud, the court will address it in its discussion of General Dynamic's motion for summary judgment.

Count VII - Reverse False Claims

Although not clear from the complaint, in Count VII Relator now alleges that Lockheed Martin violated § 3729(a)(7) of the FCA by submitting Modifications 5 and 6 to DSAA. Section 3729(a)(7) provides that any person "who knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government is liable to the United States Government . . .." Relator asserts that Modifications 5 and 6 constituted "reverse false claims" because the modifications "served to conceal and avoid Lockheed's obligation to refund to the United States millions of dollars that defendants were paid for work that Greece never ordered and defendants never performed." Relator's claims are based on the principle that Lockheed Martin had a duty to refund to the United States FMS funds that Lockheed Martin was not entitled to retain because defendants never earned them. The duty to refund, according to Relator, stems from Lockheed Martin's "acknowledgment of indebtedness" with respect to the funds at issue by including them within its "liability account" [the 361-01 Account] for Greece's advanced payments." Of course, how Lockheed Martin internally accounted for funds it had received is immaterial to Relator's FCA claim. Nonetheless, Relator argues that Lockheed Martin did in fact refund over $29 million to the United States.

With respect to Modification 5, which was executed in March 1993, Relator's claim turns on General Dynamic's agreement with Greece in late 1991 (prior to Lockheed Martin's

assumption of the contract) to issue a refund to reflect, (1) a reduction in the amount of "co-production support" work required under CLIN 12 ("co-production"), and (2) the value of certain tooling that General Dynamics had agreed to repurchase back from Greece.

Article 35 of Contract 5/86 contained a co-production program option that provided that a

Greek company known as Hellenic Aerospace Industries ("HAI") would produce F-16 components (aft-fuselages and air inlets) for incorporation into aircraft produced by General Dynamics. General Dynamics was to provide control tools, manufacturing support equipment, training and co-production support to help HAI. The co-production line item, CLIN 12, was originally priced at $42,480,068. Greece exercised the option in February of 1987, and General Dynamics began invoicing against CLIN 12 soon thereafter. After Greece exercised the option, the parties entered into a contract change proposal ("CCP 2805") requiring General Dynamics to perform additional tooling, raising the CLIN 12 price to $53,693,555. The price of CLIN 12 was not "fixed" in that it was subject to an agreed reduction after the first four years of the program if the level of support needed by HAI was less than anticipated.

Of the $53,693,555 contract line item price for CLIN 12, $29,167,000 was subject to reduction, leaving a total authorized price of $24,526,000. General Dynamics had collected $43,693,000 meaning it had over-collected approximately $23,167,000. In mid-November 1991 (four years after Greece exercised the option), General Dynamics met with officers from Greece and HAI to discuss adjusting the CLIN 12 price to account for the reduction of General Dynamics' co-production support and its buy back of aft-fuselage tooling. By January 1992 it appears that an agreement had been reached with respect to realignment of the co-production

16

program, with General Dynamics agreeing to repurchase the aft-fuselage tooling and give a $3,500,000 credit for reduction in the aft-fuselage co-production. General Dynamic's acceptance of the proposed agreement was specifically predicated, however, upon execution of a contract modification. General Dynamics apparently sent Greece a draft contract modification (which if signed would have been Modification 5), but for reasons unknown the modification was never executed.[3]

In March 1993, when Lockheed Martin assumed the contract, there had still been no executed agreement with respect to realignment of CLIN 12. Lockheed Martin and Greece's first order of business was to negotiate the IECM integration program. As noted above, the memorialization of the agreement as to that program was executed in what became Modification 5. It is undisputed that Modification 5 was a "single purpose" modification done as quickly as possible to accomplish the discreet task of adding CLIN 15 for the IECM integration. Nonetheless, Relator argues that Modification 5 was false, because it continued to list the co-production CLIN 12 price as $53,693,555. This, according to Relator, gave the false appearance that the price of the contract was higher than it actually was, enabling Lockheed Martin to conceal the fact that it had collected for work it never performed.

This entire theory fails, however, because a reverse false claim requires an "obligation" to return funds, and the undisputed facts demonstrate that at the time Modification 5 was executed the parties had not yet reached agreement on the realignment of the co-production line item. At best, the evidence shows that Lockheed Martin knew that the price of CLIN 12 would

_____

[3]The exhibits provided to the court contain only a December 17, 1991, cover letter transmitting the draft modification to Greece. The actual draft, which was attachment A to that letter, was not among the exhibits provided to the court.

be adjusted (something all parties acknowledged from the time CLIN 12 was added), but how it would be adjusted had not been determined, leaving the price as originally negotiated.

Indeed, Greece and Lockheed Martin ultimately did agree on an amount to be refunded for co-production realignment, and memorialized that agreement in Modification 6, executed in February 1996.  As Relator admits, pursuant to that written modification, Lockheed Martin refunded to the United States the value of the co-production support for which it had been paid but not performed, and it refunded the exact value that General Dynamics and Greece had agreed upon for the repurchase of the tooling.  Therefore, any claim that Lockheed Martin violated the FCA by its admission of Modification 5 to DSAA is belied by the uncontested facts.

Relator also argues, however, that Modification 6 itself constituted a reverse false claim. With respect to this claim, Relator's argument is again premised on his incorrect conclusion that Lockheed Martin somehow had a legal obligation to refund all of the money that it had internally credited to the 361-01 Account.  Thus, according to Relator, Lockheed Martin's agreed-upon refund of $29 million for the co-production realignment simply served to conceal the fact that it owed the remaining $24 million credited to the 361-01 Account.  Again, General Dynamics' or Lockheed Martin's internal accounted for funds received pursuant to the agreed-upon payment schedule did not create an obligation to pay anything to the United States.  If there was an "obligation" it had to come from some other source, such as Contract 5/86.

Until very recently, the term "obligation" was not defined in the FCA.  This lack of definition has led to much confusion, a split among the circuits and, obviously, a difference of opinion among the parties.  The Ninth, Tenth, and Eleventh Circuits all use the following definition as stated in <u>U.S. v. Bourseau</u>, 531 F.3d 1159, 1169 (9th Cir. 2008):

> To recover under the False Claims Act, . . . the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of the indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed . . .. The deliberate use of the certain, indicative, past tense suggests that Congress intended the reverse false claims provision to apply only to existing legal duties to pay or deliver property.

Interpreting the above standard, the Eighth Circuit has held that "[a] debt, and thus an obligation under the meaning of the False Claims Act, must be for a fixed sum that is immediately due." U.S. v. Q Intern. Courier, Inc., 131 F.3d 770, 774 (8th Cir. 1997). Although the reasoning in Q Intern. is persuasive, no other circuit had adopted its specific holding that an obligation must be for a fixed sum that is immediately due. The Seventh Circuit has not weighed in on this issue. Whether an obligation requires a fixed sum immediately due has become a major bone of contention among the parties, for Relator has been unable to identify a fixed sum immediately due and payable by Lockheed Martin to the United States at the time Lockheed Martin executed the certification that accompanied Modification 6.

Recently, on May 20, 2009, the Fraud Enforcement and Recovery Act of 2009 ("FERA") was enacted. Section 4 of that Act is entitled "Clarifications to the False Claims Act to Reflect the Original Intent of the Law," and amends the original Act. Of particular import to the instant case, FERA amended 31 U.S.C. § 3729(b)(3) to include the following definition of obligation:

> (3) The term "obligation" means an established duty whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

By its own terms Amended § 3729(b)(3) applies only to conduct on or after the date of enactment, and does not apply to the instant case. Nonetheless, Relator argues that the legislative history of FERA shows that it was intended to resolve current confusion among the courts as to the meaning of the term obligation. The Senate Judiciary Committee Report (March 23, 2009 at 14) indicates:

> [T]his legislation addresses current confusion among courts that have developed conflicting definitions of the term "obligation" in § 3729(a)(7). The term "obligation" is now defined under new § 3729(b)(3) and includes fixed and contingent duties owed to the government - - including fixed liquidated obligations such as judgments, and fixed, unliquidated obligations such as tariffs on imported goods. It is also noteworthy to restate that while the new definition of obligation" expressly includes contingent, non-fixed obligations, the Committee supports the position of the Department of Justice that current § 3729(a)(7) "speaks of an 'obligation,' not a 'fixed obligation.' By including contingent obligations such as, "implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship," this new section reflects the Committee's view, held since the passage of the 1986 Amendments, that an "obligation" arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instant where there is a relationship between the government and a person that "results in a duty to pay the government money, whether or not the amount owed is yet fixed."

Relator argues that this ends the debate and he need not demonstrate a fixed sum immediately due and payable from Lockheed Martin to the government at the time Modification 6 was executed. As Lockheed Martin (and General Dynamics) point out, however, the Supreme Court has repeatedly stated that "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." See Doe v. Chao, 540 U.S. 614, 626 (2004) (citations omitted). Thus, defendants argue that any analysis of the legislative intent must focus on the legislative history of the original Act. This is precisely what the Q Intern. court did and, as noted, its reasoning is persuasive.

Nonetheless, for purposes of the instant case, the court need not reach the issue of whether a "fixed sum immediately payable" is a requirement for a reverse false claim violation. The relevant inquiry is whether Lockheed Martin had a "present duty"[4] to pay money at the time of the execution of Modification 6, whether or not the precise amount had been fixed. As explained below, the court concludes that the undisputed facts demonstrate that Lockheed Martin had no such duty.

Although perhaps not as enlightening as Relator argues with respect to interpretation of the old Act, FERA's legislative history is the place to start with respect to the new amendment. That legislative history indicates that the amendment did make one significant addition to the definition of obligation. The new § 3729(b)(3) includes an established duty arising "from the retention of any overpayment." As noted in the Senate report (p. 15):

> This new definition will be useful to prevent government contractors and others who receive money from the government incrementally based on cost estimates from retaining any government money that is over paid during the estimate process. Thus, the violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the government about the overpayment. . . . Accordingly, any knowing and improper retention of an overpayment beyond or following the final submission of payment as required by statute or regulation – including relevant statutory or regulatory period designated to reconcile cost report, but excluding administrative and judicial appeals – would be actionable under this provisions.

This history indicates that retention of overpayment did not create an obligation under the former provisions of the FCA. Therefore, because FERA does not apply to the instant action, the court concludes that Lockheed Martin did not violate the FCA by retaining an overpayment prior to reconciliation.

_____

[4]The Amended Act requires an "established duty." This change in language would not alter the court's analysis.

Relator presents five theories to establish Lockheed Martin's duty to refund money at the execution of Modification 6. First, as noted above, Relator argues that Lockheed Martin had a duty to refund the entire balance of the 361-01 Account. Relator argues that the duty was "contractual," but directs the court to no specific contract provision that would create that duty aside from his argument relating to spares and co-production already rejected above. Relator also argues that Lockheed Martin "acknowledged the indebtedness" because it treated the funds in the account as a liability. He argues that Lockheed Martin treated these funds as "customer deposits" or essentially loans. Relator then cites to a number of cases for the unremarkable position that listing a debt on a financial statement is an acknowledgment of indebtedness.

None of the cases cited, however, held that the maintenance of a general ledger account is an acknowledgment of a debt sufficient to form an obligation under the FCA. Indeed, none of the cases involve the FCA at all. In fact, no case holds that receipt of payments for work yet to be performed under a fixed payment contract creates an obligation to refund prior to the final determination of the amounts due under the contract. The instant contract had specific procedures to be followed to determine the amount due to Lockheed Martin (or from Lockheed Martin to the government in the case of a refund). All of the evidence suggests the parties followed those procedures. Accordingly, the court rejects Relator's claim that Lockheed Martin had a present obligation to refund the entire balance of the 361-01 account upon execution of Modification 6.

Relator next argues that Lockheed Martin had a duty to refund a $5.4 million tooling cost overrun with respect to CCP 2805, which was part of the co-production program. As noted above, after Greece exercised the co-production option in February 1987 (CLIN 12), General

Dynamics and Greece agreed to CCP 2805, requiring General Dynamics to provide additional tooling for a price of $12,892,177. CCP 2805 was specifically added to CLIN 12, raising its total price to $53,693,555. According to Relator, General Dynamics incurred costs of $18.3 million to perform the tooling work, meaning that it had a cost overrun of $5.4 million. Relator argues that because CCP 2805 was fixed price, General Dynamics was required to absorb the overrun. Instead, Relator claims that when it came time for Lockheed Martin to negotiate the realignment of CLIN 12, it "deliberately but secretly" included the $5.4 million cost overrun in the cost basis it used to calculate the value of its work under CLIN 12 as a whole.

Lockheed Martin's response is simple. First, there is nothing in the contract that requires General Dynamics or Lockheed Martin to disclose any cost information, even when negotiating the refund. Perhaps Relator would be correct if CCP 2805 was a separate fixed contract. Then, General Dynamics could collect only the agreed price no matter the cost of its work. But CCP 2805 was specifically added to CLIN 12, and the co-production refund was negotiated as to that line item as a whole, not by components. The evidence demonstrates that after lengthy negotiations the parties reached a settlement of the refund based on an agreed price of the total work performed. Lockheed Martin payed the agreed refund. Thus, Relator has failed to identify any "obligation" to pay more.

Relator's third theory with respect to Modification 6 is that Lockheed Martin used some of the funds collected under the co-production program to pay for its work on the Peace Xenia II contract. This "diversion" of funds, according to Relator, was in derogation of the terms of Contract 5/86 and Lockheed Martin's contractor's certification agreement.

According to Relator, in 1994 Lockheed Martin, Greece and HAI met and agreed that Lockheed Martin would commit to Greece two CCPs (one for $750,000 and the other for $576,000) to provide co-production support to HAI "in connection with the Peace Xenia II co-production program." Relator claims that "despite the fact that these two CCPs were intended to fill an offset commitment that Lockheed had made under PX II, Lockheed and Greece agreed to fund the CCPs (Nos. 2849 and 2850) from Contract 5/86" because it had "sufficient funds to cover this effort." Therefore, even though the parties incorporated the two CCPs into Contract 5/86 and Modification 6, the terms of the modification failed to disclose that the CCPs covered work under the other contract (Peace Xenia II). By incorporating the two CCPs Lockheed Martin deducted the $1,226,000 from the amount that Relator contends would otherwise have been refunded to the United States.

This argument is not supported by the documentary evidence, which indicates that Relator is confused as to how the co-production program worked. Relator's argument confuses the CLIN 12 co-production support supplied by the contract, with the actual parts co-produced by HAI. Under Contract 5/86, Lockheed Martin was required to provide co-production support in the form of tooling and training, which Greece (HAI) needed to produce F-16 parts. CCPs 2849 and 2850 were added to Contract 5/86 as part of Lockheed Martin's obligation to provide that support. The parts that HAI manufactured with that support were used on the Block 50 aircraft produced under the PX II contract. Thus, the work performed by Lockheed Martin under CCP 2849 and 2850 fulfilled Lockheed Martin's co-production support obligation under Contract 5/86, while the parts manufactured by HAI fulfilled Greece's offset obligation under

PX II, to manufacture F-16 parts for Lockheed Martin. Thus there was no payment to Lockheed Martin for work performed under the PX II contract.

Relator's next claim with respect to Modification 6 is that Lockheed Martin unlawfully retained and failed to refund $1,891,146 that General Dynamics had collected from Greece to pay the United States government "additional facilities rental" recoupment charges. Under the contract, recoupment amounts collected under the contract were to be "passed through" to the United States government.

Relator's argument is based entirely on a 1993 memorandum written by Ralph Beaugez, a General Dynamics and later Lockheed Martin contract department employee. Defendants' initial interrogatory answers admitted that Beaugez's memorandum concluded that General Dynamics had collected $29,047,706 for recoupment but paid only $27,156,560 to the United States, leaving a balance of $1,891,146 unpaid. According to Relator, defendants can produce recoupment checks to the United States totaling only $27,156,560.

Lockheed Martin filed supplemental answers to the interrogatories indicating that the Beaugez memo was incorrect because Beaugez did not have access to all available information. As explained by Melissa Overstreet, Lockheed Martin's Rule 30(b)(6) deponent on this issue, additional facilities rental recoupment are charges paid to the United States government for use of United States facilities used to produce defense equipment for foreign countries. Additional facilities rental recoupment charges are calculated through a formula based on a number of manufacturing, engineering and logistic hours accrued on a particular contract. The payment of additional facilities rental recoupment, however, is done on a plan/facility-wide basis, as opposed to a contract specific basis. Because such charges are accrued on a facility-wide basis

and monitored by the accounting department, individual contracts for which the charges are accrued do not have an influence over the calculations of payments. The documents supplied by Overstreet established that the checks written to the government under Contract 5/86 for additional facilities rental recoupment exceeded $3,900,000. In a meeting with Overstreet, Beaugez admitted that his 1993 memo was erroneous. In fact, cost performance reports and projected budget reports that Beaugez analyzed indicated that the $27,157,000 of recoupment charges paid to the United States was correct, but it did not include "additional facilities recoupment." The reports pertain to R&D (research and development) recoupment, which was budgeted for $27,157,000 and for which $27,157,000 was paid.

In his surreply, Relator does not dispute the accuracy of any of Overstreet's testimony or the documents offered in support. Instead, Relator simply relies on the general rule than in analyzing a motion for summary judgment the evidence of the non-movant is to believed and all justifiable inferences are to be drawn in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Of course, inferences must be justified, and if the undisputed evidence indicates that the evidence the non-movant relies on is inaccurate the court cannot accept it as true. Because all of the evidence indicates that the additional facilities rental recoupment was paid, defendants' motion for summary judgment on this issue is granted.

Finally, Relator argues that Lockheed Martin was required to pay interest on the $29 million refund pursuant to Modification 6. Relator admits that Contract 5/86 does not contain an express provision for such interest, but argues that such a provision should be implied to effectuate the intent of the parties. The court disagrees. Contract 5/86, an extensive, sophisticated and comprehensive contract, resulting from several years of negotiation. If the

parties intended to include interest provisions they certainly could have done so.  Indeed, Article 9.5 provided that in the event Greece failed to make timely payments under the schedule, interest would run on the overdue payments.  The parties knew how to and did provide interest for late payments, but elected not to impose an interest requirements on defendants for any refunds or reductions in scope called for by the contract.  Given that decision, the court sees no reason to imply such a provision.  See ConFold Pacific, Inc. v. Polaris Industries, Inc., 433 F.3d 952, 955 (7th Cir. 2006).

For all the reasons explained above, Lockheed Martin's motion for summary judgment is granted.

General Dynamics' Motion for Summary Judgment

As noted above, Relator's complaint does not present each claim in a separate count. Instead, each count appears to contain various claims against both defendants.  This confusing pleading method has aided Relator's presentation of a moving target, and made it impossible to analyze General Dynamic's motion for summary judgment count by count.  Consequently, the court must analyze the motion theory by theory as has General Dynamics.  The court will endeavor, nonetheless, to note whenever possible where the theories appear in the second amended complaint.

Reverse False Claims

In Count VI, Relator alleges that General Dynamics violated § 3729(a)(7) by submitting a "misleading excerpt of Contract 5/86 Modification 3" which concealed General Dynamics' "obligation" to refund millions of dollars that it was paid for work Greece had never ordered and that General Dynamics never performed in connection with the Spares CLIN 3.

General Dynamics has moved for summary judgment on this claim arguing, as did Lockheed Martin, that Relator is unable to identify the source of any "obligation" to refund money it had properly received under the milestone payments, even if it had received payment for work not yet performed.

As noted, General Dynamics sold spare parts to Greece under CLIN 3, which was one of the original ten CLINs within the Basic Program and was included in the contract's initial payment schedule. General Dynamics submitted invoices against the collective value of the basic program. Under Article 8.5, the total price of the Spares component consisted of both a service element and a hardware element. The hardware price indicated in the initial CLIN was intended to be an estimate based on Greece's forecast of its need. The actual price was to be determined by adding the prices of the individual parts actually authorized "during the life of the contract." The forecasted value was to be used on an interim basis until such time as the value could be adjusted to reflect the outcome of a Spares selection conference to be held in January of 1987. The adjustment was to be incorporated into the contract price, payment schedule, and other articles and annexes as may be appropriate prior to the March 31, 1987, payment.

Modification 3 was executed in September 1990. It documented a number of changes to the contract requirements and scope. Those changes impacted the total contract price, including a number of CLINs. The Spares CLIN 3 was reduced from $69 million to approximately $30.3 million. Other CLINs were increased. Greece did not request a refund at that time.

Relator asserts that at the time Modification 3 was executed, General Dynamics had already billed and received the total $69 million that was part of the original CLIN 3 forecast. Because Modification 3 reduced the Spares line item by approximately $39 million, Relator

28

asserts that General Dynamics owed the government a $39 million refund. He claims that Modification 3 violated the False Claims Act because it did not reveal that the refund was due.

Because simple retention of an overpayment until the final contract price could be determined would not (at least under the former law) create a present obligation to refund the money, Relator must identify a specific contract provision that creates the obligation. According to Relator, that obligation is found in Article 38, which contains the procedures for termination of the contract.

Specifically, Relator argues that a jury could infer that when Greece determined the amount of Spares it wanted to purchase and agreed to reduce the price of CLIN 3 to $30 million in Modification 3, it partially terminated the line item with respect to all other Spares it could have but did not order. Thus, Relator argues that Greece's selection of Spares pursuant to Article 8, constituted a partial termination under Article 38.3, which provides that Greece could terminate the contract in whole or in part for its convenience with respect to any unaccepted and undelivered items. This argument is both nonsensical and contradicted by the documentary evidence.

Article 38 governs termination of the contract and sets forth a litany of procedures to be followed should either party elect to terminate in whole or in part. The first of those requirements is a written notice of termination. No such notice was ever sent and there is simply no evidence to suggest that the parties ever considered any part of Modification 3 as a notice of termination. None of the other procedures to be followed as set forth in Articles 38.4 and 38.5 were followed.

Greece's determination of Spares to be purchased was a selection made pursuant to Article 8. The CLIN 3 price was adjusted pursuant to Article 8. Ultimately a refund was negotiated between Lockheed Martin and Greece also pursuant to Article 8. Any argument that Greece terminated CLIN 3 in part is simply unfounded.

Perhaps recognizing the fallacy of his termination position, Relator also argues that the court should imply into the contract a term requiring General Dynamics to refund immediately any overpayment received as a result of an election by Greece to reduce the scope of General Dynamics' work under the contract. This argument is no more persuasive than Relator's argument that the court should imply an interest clause. Contract 5/86 was a sophisticated, comprehensive contract that contains provisions that anticipated the possibility of changes to the contract price. The undisputed evidence establishes that those provisions were followed. No such contract provision required an immediate refund, and the court will not imply one. Accordingly, General Dynamics' motion for summary judgment on Relator's reverse false claims contained in Count VI is granted.

<u>Spares and Depots - Counts I, II and V</u>

General Dynamics' certification agreement required it to certify that there were "no other amendments, modifications, side letters or supplementary agreements" and "that any future changes to the terms of [the contract] will be reported to DSAA upon effect." In Counts I, II and V Relator alleges that changes were made to the contract regarding the Spares and the Depot Program that were not timely reported to DSAA in violation of the certification.

As noted, the pricing of the sale by General Dynamics to Greece of spare parts was governed by Article 8.5, which provided that the hardware price element was a reference

planning number only, based on Greece's forecast. The actual hardware price was to be determined "summing the prices of the individual items of hardware <u>authorized by Greece during the life of the contract</u>." (Emphasis added.) The forecasted value was to be used on an interim basis until "such time as the value can be adjusted to reflect the outcome of the Spares selection conference in January 1987." That adjustment was to be incorporated into the contract price, payment schedule and other articles and annexes as may be appropriate prior to the March 31, 1997, payment.

According to Relator, in late 1986 Greece had decided to purchase certain Spares from another source (Westinghouse). Despite the requirements of Article 8.5, General Dynamics and Greece did not reduce the contract price and adjust the payment schedule prior to the March 31, 1987, quarterly payment to reflect the outcome of the Spares selection conference. According to Relator, this was a breach of the certification.

The uncontested evidence shows, however, that despite Greece's election to purchase some Spares from Westinghouse directly, it was still scheduled to purchase large quantities of Spares from General Dynamics. Therefore, it made no request to change the $70 million forecast at that time. As discussed above with respect to Lockheed Martin's motion with respect to Spares, the parties were continually negotiating and changing the contract based on Greece's actions. All this was anticipated in Article 8.5 and documented in written contract modifications, ultimately resulting in a refund by Lockheed Martin.

The Depot Maintenance Program was set out in CLIN 10 and was also part of the basic program. Article 8.11 indicated that the program was subject to reassessment by Greece until completion of the applicable selection conference but not later than 12 months after the contract

effective date.  During the reassessment period General Dynamics was to limit the costs incurred

on CLIN 10 to that required to maintain the contract that was rescheduled.  Relator claims that

Greece did not reassess the Depot Program within the 12 month time frame and that General

Dynamics did not reveal that to DSAA in any of its invoices.

General Dynamics correctly argues that there is no evidence in the record to suggest that

Greece did not reassess the program; it simply chose not to amend the program at that time.

Nothing in Article 8.11 commands the parties to amend the program within the first 12 months;

it was simply subject to reassessment.  It is true that General Dynamics or Lockheed Martin, at

Greece's request, amended the price of CLIN 10 in Modifications 3, 5 and 6, but those

modifications were in writing and submitted to DSAA pursuant to the terms of the contract.

Therefore, there was nothing misleading about any of the invoices, nor was General Dynamics

improperly paid.

Relator also argues that General Dynamics overcharged for spare parts and ground

support equipment ("GSE").  According to Relator, Annex W prohibited General Dynamics from

charging more than 15% above the current FMS prices for Spares (CLIN 3) and GSE (CLIN 2)

without substantiating the price to Greece.  Because of all of its prior F-16 contracts were FMS

sales (as was PX II), General Dynamics had ready access to all FMS prices, yet deliberately

overcharged for certain Spares and GSE.

Once again, the documentary evidence fails to support Relator's claim.  The evidence

shows that whenever Greece questioned General Dynamics' prices, General Dynamics attempted

to substantiate those prices.  The fact that Greece may have challenged certain prices or may

have challenged General Dynamics' substantiation of those prices does not establish that General

Dynamics was not in compliance when it certified its invoices. Relator's only support for this claim is a statement by Tony Oliveria, General Dynamics' 30(b)(6) witness with respect to Modification 6. Mr. Oliveria simply admitted that as a result of Greece's challenge to General Dynamics' substantiation of certain prices, Lockheed Martin agreed to settle the matter by providing a credit.

Nothing in Oliveria's testimony in any way suggests that General Dynamics did not substantiate its prices. Greece disagreed, as was its right, and the parties reached a settlement, which was properly documented in Modification 6. There is simply no evidence to support a False Claim Act violation. Accordingly, General Dynamics' motion for summary judgment on Relator's claims regarding Spares and Depots in Counts I, II and V is granted.

Co-Production - (Count III)

Relator's claim regarding co-production focuses on two separate $1 million invoices sent by General Dynamics in June 1990 and August 1990. In support of each invoice General Dynamics attached the copy of the Annex AG payment schedule for the co-production program. Relator claims that the Annex AG payment schedule attached to the invoices was false. It was not.

The Annex AG payment schedule attached to the invoices indicated that:

(1) General Dynamics transferred $10,853,487 of the March 31, 1989, basic program payment to the co-production program, resulting in program cumulative payments of $41,693,487 after the transfer;

(2) General Dynamics had received cumulative payments of $45,693,487 by March 30, 1990, under the co-production program;

(3) General Dynamics would receive cumulative payments of $47,693,487 after receipt of the June and August 1990 invoices;

(4) Modification H003 (Modification 3) was "rev. 2/8/90"; and

(5) The price of the co-production program was $53,693,555.

Relator claims that the last two statements (nos. 4 and 5) were false because Modification 3 was not actually executed until September 1990 and, therefore, the price of the co-production line item was only $42,840,068 until the modification was executed. This is incorrect.

As noted above, CLIN 12 was originally priced at $42,980,068. The parties then entered into CCP 2805, raising the price to $53,693,555. The payment schedule (Annex AG) was adjusted accordingly. Thus, Annex AG was revised in February 1990, and was then included in Modification 3, which was executed in September 1990. The invoices sent by General Dynamics and approved by Greece were entirely consistent with both the original Annex AG and the February revised version. The document itself indicates that it relates to Modification 3 and that it was revised as of February 8, 1990.

Moreover, Relator's claim that General Dynamics over-billed is incorrect. He assumes that the $10.9 million retroactive transfer was effective at the time the invoices were sent (pursuant to revised Annex AG), but that the corresponding increase to the CLIN price did not become effective until Modification 3 was actually executed. If the transfer was effective when

34

agreed upon, it was because the price also increased.  Therefore, there was nothing improper about the invoices.  General Dynamics' motion for summary judgment on co-production is granted.

<u>HBDIC - Counts I and III</u>

Contract 5/86 contains an "offset agreement," which is a reciprocal arrangement whereby the customer purchases the aircraft and the seller "plows business back" into the foreign country. Article 35 of Contract 5/86 contains the offset program.  That Article required General Dynamics to establish and incorporate a Greek business development company known as the Hellenic Business Development and Investment Corp. ("HBDIC").  General Dynamics, along with its major subcontractors General Electric and Westinghouse, agreed to capitalize HBDIC in the amount of $50 million over ten years, and became stockholders in the company.  General Dynamics, the majority stockholder, agreed to provide $32.85 million of the capitalization payment, as well as the salaries of three Greece-based management officials.

According to Relator, United States law prohibits the use of FMS funds to pay for such indirect offsets.  Relator argues that General Dynamics executives knew that FMS funding would not be approved to pay for HBDIC-related obligations but nonetheless secretly priced its HBDIC related obligations into contract 5/86 and secretly treated those obligations as "costs" that it paid for with FMS funds obtained through its invoices under contract 5/86.  Finally, Relator asserts that General Dynamics' invoices were false because they failed to disclose the use of FMS funds to pay for HBDIC related expenses, rendering false the certification on each invoice that they were in compliance with the certification agreement in Contract 5/86.

There are numerous fallacies in this argument. First, the court has already rejected Relator's arguments that the invoices implicitly certified compliance with guidelines not expressly or specifically referenced in the contract or invoices, and the court sees no reason to revisit that issue. Yannacopoulos, 03 C 3012 Feb. 13, 2007 (N.D. Ill. 2007).

Next, as General Dynamics points out, neither the Armed Export Control Act ("AECA"), 23 U.S.C. § 2751, nor the Buy American Act, 41 U.S.C. § 10a et. seq., prohibits use of FMS funds to pay for indirect offset obligations. See e.g., GAO Report, "Concerns Over Offset Generated with United States Foreign Military Financing Program Fund," June 1994 at 3, 8, 12.

Because the implied certification argument fails, Relator argues that the invoices violated paragraph 4 of the certification agreements, which required General Dynamics to identify all non-U.S. origin or non-U.S. manufactured items and components, and non-U.S. services procured or to be procured specifically for its Purchase Agreement with Greece. Relator also argues that the invoices violated paragraph 6, which certified that "funds received by the contractor from the United States government under the Purchase Agreement will not be used to purchase services other than described in paragraph 5 [requiring the identification of any consultants receiving a commission or contingent fee], utilized in the execution of the Purchase Agreement from non-U.S. contractors or individuals or individuals that are not residents in the United States of America unless financing of such services is expressly authorized by DSAA." By their own terms neither provision applies to HBDIC. Paragraph 4 requires that materials or components be predominately United States manufactured. Paragraph 6 relates to payments of commissions and contingent fees to foreign sales agents. Neither has any application to HBDIC.

Finally, the undisputed evidence shows that all payments for HBDIC came from General Dynamics corporate bank accounts out of the corporate coffers by the corporate treasurer, not specifically from the Fort Worth division or specifically from funds collected on Contract 5/86. Thus, there is no evidence that "FMS" funds were used to pay for HBDIC. Accordingly, General Dynamics' motion for summary judgment regarding HBDIC is granted.

Down Payment

Although nowhere to be found in any of the specific counts of the second amended complaint, Relator argues that General Dynamics' receipt of the initial $24 million down payment violated paragraph 7 of the certification agreement, which provided that General Dynamics "agrees to certify on down payment invoice that payment requested does not exceed contracted costs incurred at the time of submission of invoice (plus termination liability, less profit, to be incurred prior to the first follow-on payment)."

Relator hired an expert, Mark LoManto, who calculated what he termed "actual termination liability" and found it to be less than the down payment General Dynamics received. Therefore, because General Dynamics had minimal costs up to that point, Relator argues that General Dynamics violated paragraph 7 of the certification. Mr. LoManto's calculations, however, interpret the contract in a manner inconsistent with the actual terms as well as the undisputed facts regarding the negotiation of those terms.

The term "termination liability" was used to describe an amount agreed to in advance by the parties to be paid or guaranteed by the Greek government to General Dynamics up front as security. The payment or guarantee was necessary to protect General Dynamics against the risk of termination of the contract by Greece. As a private company General Dynamics had little or

no recourse against Greece in the event of such a termination. The quarterly payments, including the initial down payment, were not large enough to cover Greece's termination liability. Therefore, even before the down payment, the HAF was required to obtain a letter of credit ("LOC") issued by the Bank of Greece covering the difference between the payments and termination liability. The contract documents in Annex AF show the schedule of payments versus the termination liability.

Relator makes much of the fact that the termination liability figures in Annex AF were forecasts, but a forecast is entirely consistent with the purpose of the terms of the contract. If the parties actually intended the term "actual termination liability" to mean what Mr. LoManto testified, there could never have been a down payment and there would have been no need for the LOC because payments would always be greater than termination liability. All the documentary evidence and deposition testimony indicates just the opposite -- that "termination liability" was a number picked by the parties to secure General Dynamics in the event of an early termination, and that the down payment invoice was substantially less than the termination liability at that point in time. Accordingly, General Dynamics' motion for summary judgment on Relator's down payment claim is granted.

Milestones 18 and 19

Finally, Relator argues that the June 1990 and August 1990 invoices were false because they included a certificate of work-in-progress that certified that "timely progress is being made in the performance required by the aforementioned contract as indicated by completion of Milestone 1 through18 [for the August invoice "through 19"] as set forth in the Milestone Plan in

38

Annex T of the contract."  In fact, the parties never agreed to Milestones 18 and 19.  Therefore, the certifications, according to Relator, were false.

Under Modification 3, the parties agreed to Milestone Events 1 through 16, corresponding to the first through sixteenth quarterly payments, and amended Annex T accordingly.  The parties never reached agreement on Milestones 18 and 19.  Under Annex T-4 of the contract, if they could not agree to subsequent milestones, "then subsequent payments will be due and payable on the last day of each calendar quarter."  Therefore, although the parties never reached agreement on the milestones, the quarterly payments were due under Annex T. Consequently, there is nothing misleading or fraudulent with respect to the invoices or certification.  Accordingly, General Dynamics' motion for summary judgment on Relator's Milestone 18 and 19 claims is granted.

For the reasons detailed above, General Dynamics' motion for summary judgment is granted.

**General Dynamics' Renewed Motion for Summary Judgment on the Express Certification Claim**[5]

In its February 2, 2007, memorandum opinion and order the court granted General Dynamics' motion for summary judgment on Relator's claim that General Dynamics eliminated an economic price adjustment clause ("EPA Clause") that was contained in Article 11 of the draft contract, without notifying DSAA prior to execution of the final contract in January 1987. Relator had claimed that by mid-June 1986 General Dynamics and Greece had agreed to remove

---

[5]General Dynamics has moved for leave to file its renewed motion for summary judgment (Doc. No. 362).  Because, as explained below, the court finds the renewed motion to be meritorious, the motion for leave to file is granted.

the EPA Clause from the contract, but failed to inform DSAA at that time.  General Dynamics submitted three invoices totaling $7 million in late June, September and December 1986, each time certifying that it was in compliance with the certification agreement, which required that DSAA be notified of any changes to the draft agreement upon effect.

The court granted summary judgment to General Dynamics because the record contained a May 9, 1986, letter from General Dynamics' negotiator D. Lane Everett to John DeSoto, Chief of Commercial Services and Internal Control at DSAA, informing DSAA of certain changes to the contract.  Attached to that letter was an April 8, 1986, letter from Everett to Lt. General John Marinakas of Greece, outlining the changes.  Paragraph 4 of that letter specifically indicated that "part of the quid pro quo for the accelerated delivery schedule is the agreement that the provisions for the [EPA Clause] in Article 11 of the draft contract is no longer applicable." These same documents were sent by fax to Major John Kerrins of DSAA on July 15, 1986. Consequently, the court held that General Dynamics had put DSAA on notice of the elimination of the EPA Clause.

Relator moved to reconsider, and convinced the court that there was some confusion as to when the June 1986 oral agreement to eliminate the EPA Clause was effective and whether General Dynamics properly informed DSAA of the change and the terms of the letter of intent. In particular, there were some inconsistencies in the documents sent by General Dynamics to DSAA.  Everett's April 8, 1986, letter to General Marinakas states that the parties had agreed to remove the EPA Clause as a quid pro quo for accelerated delivery.  The May 9, 1986, letter to DeSoto indicated that the "revisions" to the LOI were set forth in Addendum 1.  Attachment C to Addendum 1 indicates that certain language of the EPA Clause was eliminated at one point and

then "restored to its original wording." Because of this confusion, the court concluded that an issue of fact existed and thus denied General Dynamics' motion for summary judgment.

The court has now exhaustively reviewed the entire record in the case, as well as a declaration from D. Blaine Scheideman, the chief negotiator for General Dynamics on Contract 5/86. This declaration, which is largely uncontested,[6] establishes that the parties had never reached agreement with how paragraph 4 of Article 11 would apply. General Dynamics insisted that it apply only to the amount that advance payments exceeded termination liability, while Greece wanted it to apply to the amount payments exceeded costs. At one point, Greece appeared to agree to apply it only to termination liability, which is why the language was originally crossed out and then restored in Addendum 1. Therefore, the parties had agreed at that point that the EPA Clause would apply only to payments in excess of termination liability. As explained above, because that would never happen under the projected schedule, General Dynamics took the position that the clause was not needed and should be eliminated. Eventually, on September 24, 1986, Greece agreed to eliminate the clause altogether, while the parties continued to negotiate the "off set" provisions and finalize the contract. All the changes were then incorporated into the final draft contract.

What this means is that at the time of the submission of the invoices, the only possible agreement as to the EPA Clause was that it would apply only to termination liability, which is what General Dynamics told DSAA, and the clause had no possible effect on the invoice payments. Consequently, the court's original grant of summary judgment to General Dynamics

---

[6]Relator argues that the declaration is inconsistent with Scheideman's deposition testimony, but it is not. The declaration goes beyond many of the questions that plaintiff's counsel asked Mr. Scheideman at his deposition, clarifies statements made in the deposition, and presents a more detailed explanation of the negotiation.

was correct, and therefore the court grants General Dynamics' renewed motion for summary judgment on Relator' express certification claim.

## CONCLUSION

For the reasons set forth above Lockheed Martin's motion for summary judgment is granted, General Dynamics' motion for summary judgment on all remaining claims is granted, General Dynamics' motion for leave to file renewed motion for summary judgment is granted, and General Dynamics' renewed motion for summary judgment is granted.

**ENTER:** **July 16, 2009**

_____
**Robert W. Gettleman**
**United States District Judge**